NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0687n.06

No. 13-2431

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 03, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DUJUAN O'NEAL, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| SHERRY BURT, | ) | |
| | ) | OPINION |
| Respondent-Appellee. | ) | |

_____/

BEFORE:  MOORE and McKEAGUE, Circuit Judges; and STAFFORD, District Judge.[*]

**STAFFORD, District Judge.**  Petitioner, Dujuan O'Neal, appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  A Michigan jury convicted O'Neal, inter alia, of three counts of felony murder and three counts of mutilation of a human body. As grounds for habeas relief, O'Neal asserts that (1) his trial counsel rendered ineffective assistance of counsel, and (2) the state unlawfully withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  The district court denied O'Neal's habeas petition but granted a certificate of appealability "as to both claims in the petition."  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we **AFFIRM** the district court's judgment.

_____

[*]The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

## I.

The facts established at trial are set forth in the opinion of the Michigan Court of Appeals, *People v. O'Neal*, No. 257333, 2008 WL 3851219, at *1–3 (Mich. Ct. App. Aug. 19, 2008), and those facts are presumed to be correct on habeas review. *See* 28 U.S.C. § 2254(e)(1). In pertinent part, the facts as outlined by the state appellate court are as follows:

O'Neal's convictions arose from a "drug deal gone bad" that took place at the Detroit residence of Jamale Stewart and his girlfriend, Tuwana Chambers, on November 19, 2002. On that date, before the drug deal took place, O'Neal stopped by Stewart's house and accompanied Stewart to a car dealership. Stewart well knew O'Neal because Stewart's mother, Felicia Stewart, had had a long-term intimate relationship with O'Neal ending in 1997 or 1998.[1] O'Neal was in Detroit on November 19, having arrived from New York—where he then lived—several days earlier.

While Stewart and O'Neal were test driving a red Ford Explorer, Stewart received a call advising him that Christopher Kasshamoun, Rany Sharak, and Wesam Akrawi were at Stewart's house to deliver thirty-five pounds of marijuana. Kasshamoun, Sharak, and Akrawi had regularly supplied Stewart with large quantities of marijuana for distribution. Rather than returning the Ford Explorer to the dealership, Stewart and O'Neal drove the Explorer to Stewart's house to meet Kasshamoun, Sharak, and Akrawi.

Once inside the house, Stewart took possession of the wrapped package containing thirty-five pounds of marijuana and gave Sharak $29,000 in cash. While Sharak was counting the cash, O'Neal said to Stewart, in private: "Let me lick these niggas." Stewart responded: "No, these are my

---

[1]The record reflects that Stewart and his mother lived with O'Neal for many years during Stewart's childhood. O'Neal is the father of Stewart's younger brother, and Stewart thinks of O'Neal as a stepfather.

people." O'Neal replied: "I'm your people." O'Neal soon after shot and killed Kasshamoun, Sharak, and Akrawi with a .357 revolver that was lying on Stewart's credenza.

When the bodies were all in the basement, O'Neal left the house and drove to Home Depot where he purchased an electric chainsaw, Shop-Vac, garbage bags, and gloves. Upon O'Neal's return, Stewart began cleaning blood from the living room floor while O'Neal went to the basement and used the chain saw to dismember the body of Kasshamoun. Chambers arrived at the house around this time where she saw both Stewart and O'Neal.

At some point, Stewart placed a number of items—including the victims' bloody clothing—into garbage bags, placed the bags in the red Ford Explorer, and drove away from the house. He did not get far before two police officers stopped the Explorer. Stewart fled on foot, eluding the police officers who later identified Stewart in a lineup. A search of the Explorer revealed a large amount of marijuana and a Mac-11 nine-millimeter firearm. The garbage bags were processed by a Detroit police officer, who testified that the bags contained fifty-one items, including bloody clothes, pagers, cell phones, some monies, and identifications of Kasshamoun, Sharak, and Akrawi.

Stewart ultimately made his way back to the house where he joined O'Neal, Chambers, and Stewart's older brother, Ramone. The four left the house in a friend's cab and checked into a hotel. During the cab ride to the hotel, O'Neal said that he would burn down the house (the bodies were still inside). Felicia Stewart joined the group at the hotel and confronted O'Neal about what had happened. O'Neal explained that he couldn't let the money get away, that he didn't really intend to kill those people, but it was too much money. At the hotel, O'Neal was seen with the $29,000 in his

hands. Some hours after O'Neal left the hotel, Stewart and Chambers saw on a television news program that their house was on fire.

O'Neal was ultimately arrested in New York and returned to Michigan where he was interviewed by law enforcement. According to Detroit Police Officer Gutierrez, O'Neal admitted that he visited the car dealership with Stewart the morning of the murders and that he had driven the Ford Explorer that same day to Home Depot where he purchased a chain saw and Shop Vac.

**II.**

Once apprehended, Stewart entered a plea agreement with the state, pursuant to which he pleaded guilty to a firearm violation and to accessory after the fact to disinterment and mutilation, for a total of eight to twelve years imprisonment. He also agreed to testify truthfully in other proceedings involving the murders of Kasshamoun, Sharak, and Akrawi. In exchange for Stewart's plea bargain, felony murder charges against Stewart were dismissed.

O'Neal was tried before a jury on three counts of felony murder, three counts of armed robbery, three counts of mutilation of a human body, one count of being a felon in possession of a firearm, and one count of possession of a firearm during the commission of a felony. He was convicted on all counts following a five-day trial. The armed robbery counts were dismissed at sentencing, and O'Neal is now serving three concurrent life sentences.

Sometime during the trial, the state provided defense counsel with a report prepared by the Drug Enforcement Administration ("the DEA Report" or "the Report") that—according to the Michigan Court of Appeals—revealed that "a person from New York named Rudy, who was related to [Stewart], came to Detroit to kill the victim after [Stewart] accepted a contract on the victim's

life."[2] *People v. O'Neal*, 2008 WL 3851219, at *5. The Report contained in the record before this Court—and also before the district court—is incomplete.[3] While the Report before this Court reflects that a confidential source ("SOI") "believes"—based on information the SOI heard from unidentified sources—that Kasshamoun, Sharak, and Akrawi "were killed by Jamal Stewart and his cousin Rudy, based on a contract put out on [Kasshamoun]," *O'Neal v. Woods,* No. 2:10cv12836–LPZ–MAR, Doc. 25–1 at 7, it does not reflect that "Rudy" came from New York. The parties do not dispute—and we therefore accept—the state appellate court's representation that the complete Report in fact referred to "Rudy" as a hitman who came from New York.[4]

Mid-afternoon on the third day of trial, the prosecutor stated on the record that defense counsel had reviewed the Report but had decided not to use it. Defense counsel acknowledged that the prosecutor's statement was "correct." *Id.* at Doc. 6–6 at 116. Later, at a post-conviction hearing, defense counsel explained that, when she said "correct" in response to the prosecutor's representation, she was simply acknowledging the trial court's earlier ruling prohibiting her from

---

[2]It is not clear from the record precisely when the state disclosed the DEA report to defense counsel. At the conclusion of the first day of trial, after the jury had been selected and excused for the day, the prosecutor asked the court to examine the Report, which had not then been disclosed to defense counsel, to determine whether it was discoverable. The court declined to do so. The prosecutor responded: "Perhaps we can readdress it tomorrow. But at this point, it's not something that I wish to turn over, because of the fact that I don't believe it's discoverable, and I don't believe it's exculpatory." *O'Neal v. Woods,* No. 2:10cv12836-LPZ-MAR, Doc. 6–4 at 128. During a post-conviction hearing held in 2006, O'Neal's trial counsel recalled that the Report may have been turned over to her before the lunch break on the third day of trial, after Stewart, his mother, his girlfriend, and two of Stewart's friends had already completed their testimony.

[3]In his appellate brief, O'Neal confirms that one page of the DEA Report is missing from the record before the federal courts.

[4]The record reflects that O'Neal had several nicknames, including Jason, Friday the 13th, and Dee. The record does not reflect that O'Neal used "Rudy" or "New York" as an alias or nickname.

referring to the Report before the jury. Unfortunately, the side-bar conference during which the trial judge made that ruling was not recorded, leaving us with no record of what was raised, discussed, or decided during that side-bar conference. When asked at the post-conviction hearing about her failure to make a record of the side-bar discussion, O'Neal's trial counsel responded: "I obviously wasn't thinking because . . . I know how to preserve a record and I don't know why I didn't say what had happened [at the side bar]." Counsel admitted that she did not request a mistrial based on the late disclosure of the Report and she did not ask for an adjournment in the proceedings to allow her to investigate the information contained in the Report.

On direct appeal, O'Neal argued—among other things—that (1) he received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), because his trial counsel failed to use the DEA Report to impeach witnesses and to provide an alternate theory of the crime; and (2) his due process rights were violated under *Brady* because the prosecutor failed to timely disclose the Report, which—according to O'Neal—contained exculpatory information. The Michigan Court of Appeals rejected both claims in alternative holdings.

Addressing O'Neal's ineffective-assistance-of-counsel claim on the merits, the Michigan Court of Appeals found that it would have been an objectively reasonable trial strategy *not* to use the Report for impeachment purposes. According to the appellate court, the information in the Report—that a relative of Stewart's came from New York to kill Chris Kasshamoun—was largely consistent with the trial testimony implicating O'Neal. Because the Report contained information that could be deemed prejudicial and *inculpatory*, the state court of appeals concluded that "defense counsel's waiver or failure to present the federal report . . . [did not] amount[] to error so serious that

-6-

counsel was not performing as the counsel guaranteed by the Sixth Amendment." *People v. O'Neal*, 2008 WL 3851219, at *5.

As to O'Neal's claim of error under *Brady*, the Michigan Court of Appeals found that O'Neal had not established error requiring reversal even assuming no waiver of the claim by O'Neal's trial counsel. The state appellate court explained:

> The failure to disclose impeachment evidence does not require automatic reversal, even where, as in the present situation, the prosecution's case depends largely on the credibility of a particular witness. The court still must find the evidence material. Undisclosed evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."

*People v. O'Neal*, 2008 WL 3851219 at *9 (quoting *People v. Lester*, 591 N.W.2d 267, 276 (Mich. Ct. App. 1998)). Noting that O'Neal only sought to use the DEA Report to impeach witnesses, the state appellate court concluded that the Report merely furnished an additional basis on which to impeach the state's primary witness (Stewart), whose credibility had already been shown to be questionable. In essence, the Michigan Court of Appeals determined that a reasonable probability did *not* exist that the outcome of the proceedings would have been different had the prosecutor disclosed the Report in a more timely manner.

Further, the appellate court opined that the trial court would not have abused its discretion had it prohibited use of the Report as claimed by O'Neal. According to the Michigan Court of Appeals, it fell within the trial court's discretion to disallow use of the Report because (1) "the federal report's minimal probative value as unsupported impeachment evidence is outweighed by the potential for unfair prejudice;" (2) "the prejudice is obvious in that the federal report contains

unsubstantiated beliefs;" and (3) the "hearsay in the federal report would lend to confusion of the issues, and even to misleading of the jury." *Id.* at *11.

O'Neal thereafter filed a timely habeas corpus petition in federal court. Applying the rigorous standard of review for a state prisoner's federal habeas petition, the district court denied O'Neal's petition for a writ of habeas corpus, finding that O'Neal failed to establish that the state court's adjudication of his claims resulted in a decision that involved an unreasonable application of either *Strickland* or *Brady*.

O'Neal now appeals the district court's denial of his habeas petition, arguing—among other things—that the state appellate court unreasonably applied Supreme Court law when it found that (1) his trial counsel was *not* ineffective for failing to utilize the DEA Report to offer an alternative theory of the murders and to impeach the credibility of the prosecution's witnesses; and (2) O'Neal was *not* entitled to relief under *Brady* based on the late disclosure of the Report.[5]

**III.**

In a § 2254 habeas proceeding, we review the district court's legal conclusions de novo, applying the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Moore v. Berghuis*, 700 F.3d 882, 886 (6th Cir. 2012). Under the ADEPA, a court may not grant a habeas petition for "any claim that was adjudicated on the merits in State court proceedings" unless the state proceedings (1) "resulted in a decision that was contrary to, or involved

---

[5]O'Neal also claims (1) that his trial counsel was ineffective (a) for failing to request and use letters written by Stewart and his mother, Felicia, to Stewart's brother, Ramone, while Ramone was in jail; and (b) for failing to call Keith Hale as an alibi witness; and (2) that the prosecutor's failure to turn over the jail-house letters prior to trial constituted a *Brady* violation. These claims, which were addressed and rejected both by the Michigan Court of Appeals and by the district court, do not merit discussion here.

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision amounts to an "unreasonable application" of clearly established federal law if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Black v. Bell*, 664 F.3d 81, 88 (6th Cir. 2011). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

"If this standard is difficult to meet, that is because it was meant to be." *Id.* "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). To obtain habeas relief from a federal court, a petitioner must show that the state court's ruling on a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Id.* at 786–87.

**IV.**

**A.**

To establish ineffective assistance of trial counsel, O'Neal must show that (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687–88. To establish deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. A court considering counsel's performance "must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. Recognizing that "[a]fter an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome," the Supreme Court has emphasized that *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 131 S. Ct. at 790; *see also Jennings v. McDonough*, 490 F.3d 1230, 1247 (11th Cir. 2007) (explaining that "[t]he *Strickland* standard of objective reasonableness does not depend on the subjective intentions of the attorney, judgments made in hindsight, or an attorney's admission of deficient performance").

To establish prejudice under *Strickland*, a petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Harrington*, 131 S. Ct. at 792 (explaining that "[t]he likelihood of a different result must be substantial, not just conceivable").

In *Harrington*, the Court explained the juxtaposition of the standards under *Strickland* and § 2254(d) as follows:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d)

are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington,* 131 S. Ct. at 788.

In this case, the Michigan Court of Appeals found that O'Neal failed to establish that his trial counsel's performance with respect to the DEA Report was deficient under the first *Strickland* prong. The state court explained why a reasonable trial counsel could choose not to use the Report as follows:

> Although at the Ginther hearing defense trial counsel maintained that she would have been effective in impeaching witnesses with the federal report . . . , defense trial counsel failed to mention that the federal report . . . also contains arguably prejudicial and inculpatory evidence. The federal report indicates a person from New York named Rudy, who was related to Jamal, came to Detroit to kill the victim after Jamal accepted a contract on the victim's life.
>
> Regardless of defense trial counsel's intent, not admitting the federal report . . . constituted reasonable trial strategy. While defense trial counsel would have gained a minor advantage in possibly being able to impeach witnesses with the report, testimony that a hit man from New York committed the offenses is particularly prejudicial to defendant. The information in the report is especially prejudicial when considering evidence presented that defendant arrived from New York three days before the murders, that Jamale picked up defendant and rented him a room, and the manner of the offenses. Defendant claims in this regard that there is no evidence that defendant is Rudy. However, there is no dispute that defendant is from New York and has numerous nicknames, including Jason, Friday the 13th and New York. Further, defendant cedes that in questioning witnesses about the federal report, that "the witnesses would likely have denied some of these facts and allegations." Thus, we cannot conclude defense counsel's waiver or failure to present the federal report . . . amounted to error so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment.

*People v. O'Neal*, 2008 WL 3851219, at *5.

A habeas court, in reviewing a state court's denial of a *Strickland* claim, may not grant the writ if "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S. Ct. at 788. Here, as determined by the Michigan Court of Appeals, there *is* a reasonable argument that competent counsel could knowingly choose not to use the Report for impeachment purposes. To be sure, the Report presented a rumor implicating both Stewart and another individual named "Rudy" in the murders. With the exception of the name "Rudy," however, the description of the other individual—a relative of Stewart's who came from New York—was strikingly close to O'Neal, the man who, by his own admission, was with Stewart on the day of the murders and drove the Ford Explorer to Home Depot to purchase the chain saw used to dismember one of the victims. A reasonable juror could discount the rumor regarding the name "Rudy" while attributing the other rumored descriptors to O'Neal. In other words, a reasonable juror could conclude that the Report corroborated the *prosecution's* theory that the murders were committed by a relative of Stewart's—O'Neal—who came from New York just days before the murders. While the Report, if believed, could cast doubt on Stewart's testimony regarding his own role in the murders, it would not necessarily cast doubt on O'Neal's role in the murders. Furthermore, not only does the Report contain information that could be inculpatory to O'Neal, any value in terms of impeachment would be minimal given trial counsel's thorough impeachment of Stewart by other means. Balancing the potential pluses and minuses, competent counsel could decide that use of the Report for impeachment purposes was more risky than beneficial.

To the extent O'Neal now suggests that the state court's decision was unreasonable because trial counsel *admitted* —at a post-conviction hearing—that she had no strategic reason for not seeking to use the Report for impeachment purposes, his suggestion is unpersuasive. Under

*Strickland*, courts give little weight to counsel's hindsight assessment of her trial actions. *See, e.g.*, *Harrington*, 131 S. Ct. at 790 (noting that the *Strickland* inquiry focuses on "the objective reasonableness of counsel's performance, not counsel's subjective state of mind"); *Strickland*, 466 U.S. at 688–89 (explaining that the question is whether counsel's performance fell "within the wide range of reasonable professional assistance" that a competent criminal defense counsel could provide under "prevailing professional norms"); *Cofske v. United States*, 290 F.3d 437, 444 (1st Cir. 2002) (noting that "as long as counsel performed as a competent lawyer would, his or her detailed subjective reasoning is beside the point"). Instead, absent appropriate rebuttal, a court must presume that trial counsel's conduct "falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Given the record in this case, we cannot conclude that the Michigan Court of Appeals unreasonably applied *Strickland* when it found that failing to use the Report for impeachment purposes—whether by choice or otherwise—falls "within the wide range of reasonable professional assistance" that a competent criminal defense counsel could provide under "prevailing professional norms." *Id.*

O'Neal claims that his trial counsel was ineffective not only because she failed to use the Report for impeachment purposes but also because she failed to use the Report to spur additional investigation. The Michigan Court of Appeals did not address this claim, although it was raised by O'Neal in his appeal. The same claim was raised in O'Neal's federal habeas petition and was rejected by the district court following de novo review. Addressing only the question of prejudice, and noting that O'Neal had done nothing more than ask the court to speculate as to what evidence might have been uncovered with additional investigation, the district court found that O'Neal failed to demonstrate "a reasonable probability that additional investigation would have resulted in an

acquittal, even assuming that an effective counsel would have taken steps to further investigate." *O'Neal v. Woods*, No. 10–CV–12836, 2013 WL 5340767, at *10 (E.D. Mich. Sept. 23, 2013).  We agree with that result.

More than two years after O'Neal was convicted, the trial court held an evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973).  At that hearing, O'Neal's post-conviction counsel argued that it was Stewart, rather than O'Neal, who committed the murders.  According to counsel, the DEA Report supplied Stewart's missing motive, making trial counsel's failure to use the Report highly prejudicial to O'Neal.  The Report, however, constitutes rank hearsay and was itself inadmissible at trial.  The portion of the Report at issue here was based on what a confidential informant heard from unknown and unnamed sources, making it triple hearsay or worse.  At the evidentiary hearing, O'Neal did not reveal what *admissible* evidence, if any, trial counsel might have discovered had she used the Report to spur further investigation.  Rather than producing admissible evidence that might undermine confidence in the outcome of the case, O'Neal instead asked the court to speculate that the outcome might have been different if only trial counsel had investigated the hearsay information contained in the Report.  Speculation, however, is not enough to satisfy a defendant's burden to prove prejudice.  *See Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004) (noting that where "one is left with pure speculation on whether the outcome of the trial . . . could have been any different," there is an insufficient showing of prejudice); *Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir. 1997) (denying petitioner's ineffective assistance claim where he presented no evidence concerning what counsel would have found had he investigated further).  As found by the district court, O'Neal did not carry his burden of demonstrating a reasonable probability

that, but for trial counsel's failure to use the DEA Report to spur further investigation, the result of the trial would have been different.

**B.**

Pursuant to *Brady*, a defendant's due process rights are violated if the government suppresses evidence material either to guilt or punishment. *Brady*, 373 U.S. at 87. A *Brady* violation thus occurs when a prosecutor "withholds evidence that is favorable to the defense and is material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 474 U.S. 667, 682 (1985). Where the disclosure of *Brady* evidence has been delayed rather than suppressed altogether, "a defendant must show what he would have done differently had he been given more time to address the *Brady* evidence, and specifically how, had the evidence been given to the defendant earlier, a reasonable probability exists that the result of the defendant's trial would have been different." *United States v. Fields*, No. 13-5150, 2014 WL 3930528, at *11 (6th Cir. Aug. 13, 2014) (internal quotation marks omitted); *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (noting that "[d]elay violates *Brady* only where the delay causes prejudice").

The Michigan Court of Appeals rejected O'Neal's *Brady* claim regarding the DEA Report finding, among other things, that timely disclosure of the Report would not have made any difference to the outcome of the trial.[6] In particular, the state appellate court determined that, given trial counsel's thorough impeachment of the state's principal witness by other means, the Report's

---

[6]In the alternative, the state appellate court held that O'Neal's trial counsel waived use of the DEA Report, creating an adequate and independent state-law bar to relief in federal court. The district court did not address the state's procedural default defense, nor do we.

incremental impeachment value was minimal. In O'Neal's federal habeas case, the district court concluded that the state court "reasonably applied *Brady* in finding that [O'Neal] had failed to establish that he was prejudiced by the late production of the federal DEA report." In the district court's words:

> [T]he report itself was inadmissible. [O'Neal] failed during the [post-conviction] evidentiary hearing to establish that earlier production of the report would have led to admissible evidence. Therefore, as stated by the Michigan court, the only use for the report would have been to attempt to further impeach Jamale by asking him whether he had the victims killed for money, and asking other witnesses whether they sold drugs on behalf of Jamale. It is not reasonably likely that such a line of impeachment would have changed the result of the trial.

*O'Neal v. Woods*, 2013 WL 5340767, at *20.

Like the district court, we conclude that the Michigan Court of Appeals reasonably applied *Brady* when it found that O'Neal failed to establish that he was prejudiced by the prosecutor's late production of the DEA Report. O'Neal has not explained what he would have found if he had been given more time to investigate the rumors contained in the DEA Report, and he has not explained, with the required specificity, how earlier disclosure of the DEA Report would have led to a different result. He has instead relied on speculation, which is inadequate to establish prejudice in the *Brady* context just as it is inadequate to establish prejudice in the *Strickland* context. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (equating the prejudice inquiry under *Strickland* with the materiality inquiry under *Brady*).

## V.

Because we find that the district court properly denied O'Neal's petition for writ of habeas corpus, we **AFFIRM.**

**KAREN NELSON MOORE, Circuit Judge, concurring.** At the state court of appeals level, Judge Helene White dissented and would have remanded for a new trial based on *Brady* violations regarding the federal DEA report and the correspondence of Jamal Stewart and Felicia Stewart. I agree with Judge White's position. However, because I cannot conclude that the position of the majority of the Michigan Court of Appeals was unreasonable under current AEDPA jurisprudence, I must join in the denial of a writ of habeas corpus.