# Supreme Court of Florida

_____

No. SC13-1233
_____

**NEIL K. SALAZAR,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC14-887
_____

**NEIL K. SALAZAR,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[February 18, 2016]

PER CURIAM.

Salazar appeals an order of the circuit court denying his motion to vacate his

conviction of first-degree murder and sentence of death filed under Florida Rule of

Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. For

the reasons that follow, we remand for a new penalty phase and deny his habeas petition.[1]

## I. BACKGROUND

The relevant facts were summarized in this Court's opinion on direct appeal:

> In the mid-1990s, Ronze "June Bug" Cummings and his girlfriend, Evelyn "Jenny" Nutter, moved from Fort Lauderdale to Fort Drum. The couple lived in a house adjacent to an orange grove where Ronze worked as the foreman. While living in Fort Drum, Nutter gave birth to two children. The children were ages two and six at the time of the killing.
> Neil Salazar was a friend of Ronze Cummings. The two previously worked together in Fort Lauderdale at Smurfit Recycling Plant. Around May to June of 2000, Salazar, his girlfriend Monica, and their young child came to live with Ronze and Nutter in Fort Drum. But after a few weeks, they moved out at Ronze's request.
> Subsequently, on June 26, 2000, Julius Hatcher, an associate of Salazar's, visited the Miami home of his cousin, Fred Cummings. Neither Fred nor his girlfriend, Shirleen Baker, was home. Instead, Salazar answered the door. Salazar invited Hatcher in and told him he had something to show him under an upstairs bed. Hatcher went upstairs and looked under the bed, but saw nothing. When he turned around, Salazar confronted him, pointing a machine gun at him. Salazar accused Hatcher of being "too clean" and "a snitch" who was planning to turn him over to the FBI regarding his drug trafficking business. Salazar duct-taped Hatcher's arms and legs and shoved his head under the bed, where he remained for several hours. Subsequently, Fred and Baker arrived home, but they did nothing to help Hatcher. Several hours later, Salazar brought Hatcher outside and forced him into a green Buick which Baker had rented. Then, Baker drove north on Interstate 95 with Hatcher in the front seat and Salazar sitting behind Hatcher, holding the machine gun. When the trio passed through Pompano Beach, Salazar removed the duct tape that bound Hatcher.

---

1. We have jurisdiction. <u>See</u> art. V, § 3(b)(1), (9), Fla. Const.

Around 11 p.m., they arrived at the home of Ronze and Nutter in Fort Drum. Hatcher went with Salazar to the back door. Salazar twisted out the back porch light bulb and broke the lock on the back door. When they entered the house, Ronze and Nutter were sitting in the living room watching television with their two-year-old son. Salazar ordered the occupants to lie on the floor and had Hatcher bind their hands and feet with the duct tape he brought with him from Miami. For about fifteen to twenty minutes, Salazar ranted about how his business was falling apart and accused the couple of communicating with the FBI. Salazar said that before he left, "somebody die tonight." Salazar also threatened to kill Hatcher if he refused to cooperate with Salazar's orders. Next, Salazar told Hatcher to retrieve some plastic shopping bags from a kitchen cabinet and a steak knife from a kitchen drawer. Salazar directed Hatcher to place the bags on Ronze's and Nutter's heads. Hatcher placed the bags on their heads but also poked a hole in Ronze's bag so he could breathe. Although Hatcher told Ronze that he would poke a breathing hole in Nutter's bag, no such hole was found when her bag was later recovered from the crime scene. Salazar then told Hatcher to duct-tape the bottom of the bags around the victims' necks, and Hatcher complied. Hatcher also duct-taped Nutter's eyes and mouth near her nose. Then, Salazar instructed Hatcher to move Ronze and Nutter into separate bedrooms.

Finding that the victims had not yet suffocated, Salazar ordered Hatcher to cut their throats with the knife. Hatcher refused. Then, Salazar gave Hatcher a .38 caliber revolver and ordered him to hold a pillow over each victim's head and shoot through the pillow. Salazar first stood in the doorway to the room where Nutter was placed, holding the machine gun on Hatcher. Hatcher shot Nutter in the head through a pillow as ordered. He then moved to the room in which Ronze was placed and Salazar stood in the doorway with the machine gun. Hatcher told Ronze to play dead before shooting him in the head through a pillow as Ronze's two-year-old son sat beside him. Still alive, Ronze stood up. Salazar ordered Hatcher to shoot him again, and Hatcher complied. Although still alive, Ronze remained on the floor, pretending to be dead.

Then, Salazar gave Hatcher the keys to a white Buick which belonged to Ronze and Nutter and told Hatcher to follow him and Baker back to Miami. Salazar and Baker sped off without waiting for Hatcher, but Hatcher was able to catch up to them by following the

taillights. Hatcher followed Salazar and Baker until they reached Interstate 95. Soon thereafter, Hatcher signaled that he was stopping to purchase gasoline. Later, Hatcher drove the car to Fred's house in Miami and spent the night in a motel.

After Salazar and Hatcher went outside, but prior to their departure, Ronze stood up, picked up his son, and checked on Nutter, finding her dead. Ronze then moved to the living room and looked out the window. He observed Salazar, Hatcher, and Baker standing near the vehicles. After the trio left the premises, Ronze attempted to call 911 from his home phone but found that the line was disconnected. Carrying his son, Ronze walked to the nearby orange grove office and called 911. Ronze told the 911 operator that three or four Jamaican men broke into his home, killed Nutter, and shot him.

Around 12:30 a.m., Deputies Joey Chapman and Javier Gonzalez of the Okeechobee County Sheriff's Department arrived at the home. They spotted Ronze in his pickup truck and followed him to the house. When they approached Ronze, he appeared nervous and was bleeding profusely from his face. A torn bag hung around his neck, and pieces of duct tape clung to his wrists, feet, and arms. Ronze's two-year-old son was with him. Ronze informed the deputies that Nutter, whom he referred to as his wife, had been killed. When the deputies asked who the perpetrator was, Ronze told them that "Neil" did it. Ronze was subsequently transported by helicopter to Holmes Regional Medical Center in Melbourne, Florida.

Detective T.J. Brock of the Okeechobee County Sheriff's Office obtained sworn statements from Ronze while he was in the hospital and upon his release. During both interviews, Ronze identified "Neil" as the perpetrator. Ronze told Brock that he had worked with Neil at a recycling plant when he lived in Fort Lauderdale and that Neil had come to live with him in the weeks prior to the crimes. Brock presented Ronze with several photographic lineups, but Salazar's photograph was not among those presented. To assist Brock, Ronze retrieved a videotape from his home which depicted Salazar, Monica, Ronze, Nutter, and their children at the beach during the time period that they lived together. Ronze informed Brock that Neil was not the actual shooter but ordered another man to carry out the killing.

About one week after Ronze was released from the hospital, Hatcher went to the Miami-Dade Police Department and gave a statement regarding the shooting. During a July 5, 2000, taped

interview with Detective Brock, Hatcher confessed to the crimes. His confession was largely consistent with Ronze's description of the events surrounding Nutter's death.

On July 19, 2000, Hatcher and Salazar were charged by indictment with: (1) the first-degree murder of Evelyn Nutter; (2) the attempted first-degree murder of Ronze Cummings; (3) burglary of a dwelling while armed; and (4) theft of a motor vehicle. Hatcher's trial was postponed when he agreed to testify against Salazar in exchange for the State's promise not to seek the death penalty in his case.

Salazar's trial commenced on March 6, 2006. During the State's case, Dr. Frederick Hobin, the medical examiner who performed Nutter's autopsy, testified that Nutter died as the result of "multiple episodes of violence," the more lethal of which was the bullet injury to her head. According to Dr. Hobin, had Nutter not been shot, she would have certainly died from asphyxiation as a result of the bag over her head and the duct tape on her face. Following the State's case, the defense rested without presenting any evidence or witnesses.

On March 9, 2006, the jury returned guilty verdicts with special interrogatories, convicting Salazar of: (1) the first-degree murder of Evelyn Nutter while carrying, displaying, or using a firearm under both the premeditated and felony murder theories; (2) the attempted first-degree murder of Ronze Cummings; (3) burglary during which an assault was committed; and (4) theft of a motor vehicle. After the penalty phase, the jury unanimously recommended death. Finding four aggravators,[N. 1] no statutory mitigators, and six nonstatutory mitigators,[N. 2] the trial court followed the jury's recommendation and sentenced Salazar to death.

> [N1.] The trial court found and weighed the following aggravators: (1) Salazar had a prior violent felony conviction, the contemporaneous attempted first-degree murder of Ronze Cummings, assigned some weight; (2) Salazar committed the murder while engaged in the commission of a burglary, assigned some weight; (3) the murder was committed in an especially heinous, atrocious, or cruel (HAC) manner, assigned great weight; and (4) the murder was committed in a cold, calculated, and premeditated (CCP) manner without any pretense of moral or legal justification, assigned great weight.

[N2.] The trial court found and weighed the following nonstatutory mitigators: (1) Salazar was not the actual shooter, assigned little to some weight; (2) Salazar comes from a broken home and was devastated by his parents' divorce, assigned little weight; (3) Salazar was raised in an impoverished environment in a third world country, assigned minimal weight; (4) Salazar is capable of and has a good relationship with his family members, assigned minimal weight; (5) Salazar was a good student, attended school regularly, and obtained a vocational degree in woodworking, assigned little weight; and (6) Salazar was well behaved during the court proceedings, assigned minimal weight.

Salazar v. State, 991 So. 2d 364, 368-70 (Fla. 2008) (two footnotes omitted).

On direct appeal, this Court affirmed Salazar's conviction and death sentence.[2] Id. at 380. Thereafter, the United States Supreme Court denied Salazar's petition for writ of certiorari. Salazar v. Florida, 555 U.S. 1187 (2009).

On February 8, 2010, Salazar filed a motion for postconviction relief. On June 11, 2013, the trial judge entered an order denying all of Salazar's claims.

---

2. On direct appeal, Salazar raised five issues: "(1) whether the trial court erred in denying Salazar's motion for a mistrial based on improper prosecutorial comments during guilt-phase final arguments; (2) whether the trial court erred in allowing the State to present improper self-bolstering witness testimony; (3) whether the trial court erred in finding the cold, calculated, and premeditated (CCP) aggravator; (4) whether the trial court erred in allowing the State to argue during penalty phase closing arguments that the victims were terrorized; and (5) whether Florida's death penalty statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 609 (2002)." Salazar, 991 So. 2d at 370-71.

Salazar appeals the trial court's order, raising nine issues. Salazar also petitions

this Court for a writ of habeas corpus, raising two issues.

## II. POSTCONVICTION MOTION

### A. Summarily Denied Claims

Salazar argues that the trial court erred in denying several of his

postconviction claims without an evidentiary hearing. However, because the

claims Salazar mentions are either without merit or untimely, we affirm the trial

court's summary denial.

An evidentiary hearing must be held on an initial 3.851 motion whenever the

defendant makes a facially sufficient claim that requires a factual determination.

See Amends. to Fla. Rules of Crim. Pro. 3.851, 3.852 & 3.853, 772 So. 2d 488,

491 n.2 (Fla. 2000). However, "[a] court may summarily deny a postconviction

claim when the claim is legally insufficient, procedurally barred, or refuted by the

record." Troy v. State, 57 So. 3d 828, 834 (Fla. 2011). Because a court's decision

whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based

on written materials before the court, its ruling constitutes a pure question of law,

subject to de novo review. See Reynolds v. State, 99 So. 3d 459, 471 (Fla. 2012).

Salazar claims that the postconviction court erred in summarily denying

various claims of ineffective assistance of counsel. First, Salazar contends that the

trial court should have granted a hearing regarding Salazar's requests to order the

State to produce the records relating to his extradition and alibi defenses to allow Salazar the opportunity to refute the State's witnesses' testimony. However, these issues relate to Salazar's claims that trial counsel was ineffective for failing to challenge his extradition and investigate and present his alibi defense, for which the trial court did grant an evidentiary hearing. Therefore, because Salazar was granted an evidentiary hearing on these ineffectiveness claims, Salazar's claim that the trial court erred in summarily denying his arguments related to his ineffectiveness claims is without merit.

Additionally, Salazar alleges that the trial court should have granted an evidentiary hearing on his claims that: (1) trial counsel was ineffective for failing to retain and present testimony of a ballistics expert, and (2) trial counsel should have investigated and presented an available defense and called Fred Cummings as a witness at trial. These claims were included in an amendment to his postconviction motion, but the trial court concluded these amended claims were unauthorized and untimely. These specific claims first appear in Salazar's pro se second amended motion filed on June 20, 2012, however, in his initial motion for postconviction relief filed on February 8, 2010, Salazar raised various issues for his claim for ineffective assistance of counsel. Florida Rule of Criminal Procedure 3.851(d) requires in pertinent part that motions for postconviction relief must be filed within one year from when the conviction and sentence become final unless

the claim is based on newly discovered evidence. Because these additional ineffective assistance of counsel claims are not based on newly discovered evidence, they are untimely. Moreover, "[a] defendant may not raise claims of ineffective assistance of counsel on a piecemeal basis." Vining v. State, 827 So. 2d 201, 212-13 (Fla. 2002). Therefore, we affirm the trial court's summary denial of these claims.

Next, Salazar argues that the trial court should have granted an evidentiary hearing on his claim that trial counsel was ineffective for failing to have Salazar evaluated for competency and for allowing Salazar to proceed to trial while incompetent. Specifically, Salazar claims that trial counsel was ineffective in not providing sufficient information to Dr. Harry Krop for his competency evaluation of Salazar. However, the trial court did grant an evidentiary hearing on Salazar's claims that trial counsel failed to obtain an adequate mental health evaluation and Salazar is ineligible to be executed because he is intellectually disabled. As part of these claims, the trial court considered the testimony of Dr. Krop and his competency evaluation of Salazar. Therefore, this claim is without merit.

Accordingly, because the claims Salazar mentions are either without merit or untimely, we affirm the trial court's summary denial.

**B. Alleged Conflict of Interest**

Next, Salazar claims that trial counsel acted under an actual conflict of interest in his representation of Salazar, Salazar did not waive that conflict, and he was denied the right to counsel as guaranteed under the Sixth Amendment. We affirm the trial court's denial of relief.

Trial counsel testified at the evidentiary hearing that he had been employed by the public defender's office and that office had represented codefendant Julius Hatcher while he worked there. However, trial counsel also testified that he had no role in Hatcher's case, did not discuss any strategy with anyone who was involved in defending Hatcher, and did not possess any privileged information regarding Hatcher's case. Additionally, Mark Harllee, the attorney who actually represented Hatcher, testified that the attorneys at the public defender's office did not have regular meetings and did not provide case status updates to each other. More specifically, Mr. Harllee testified he had no recollection of discussing Hatcher's case with trial counsel. Therefore, Salazar has failed to identify specific evidence that suggests that his interests were compromised and has failed to demonstrate an actual conflict. See Hunter v. State, 817 So. 2d 786, 791-92 (Fla. 2002) ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." (quoting Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)). Accordingly, we affirm the trial court's denial of this claim.

## C. Ineffective Assistance of Counsel During the Guilt Phase

Salazar raised multiple claims of ineffective assistance of counsel during the guilt phase, which the trial court denied after an evidentiary hearing. We affirm.

Following the United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), this Court explained that two requirements must be met for ineffective assistance of counsel claims to be successful:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

<u>Bolin v. State</u>, 41 So. 3d 151, 155 (Fla. 2010) (quoting <u>Maxwell v. Wainwright</u>, 490 So. 2d 927, 932 (Fla. 1986)).

Regarding the deficiency prong of <u>Strickland</u>, there is a strong presumption that trial counsel's performance was not ineffective. <u>Strickland</u>, 466 U.S. at 689. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Id.</u> The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " <u>Id.</u> (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)).

- 11 -

Regarding the prejudice prong of Strickland, "the defendant must show that there is a reasonable probability that, 'absent the [deficient performance], the factfinder would have [had] a reasonable doubt respecting guilt.' " Henry v. State, 948 So. 2d 609, 617 (Fla. 2006) (quoting Strickland, 466 U.S. at 695). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.' " Id. (quoting Strickland, 466 U.S. at 694).

"Because both prongs of Strickland present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence, but reviewing the trial court's legal conclusions de novo." Dennis v. State, 109 So. 3d 680, 690 (Fla. 2012).

**1. Salazar's Transport From St. Vincent to Puerto Rico and Puerto Rico to the United States**

First, Salazar argues that his trial counsel provided ineffective assistance for failing to investigate and pursue Salazar's illegal transport to the United States for trial. More specifically, Salazar claims that his prosecution in Okeechobee County violates the extradition treaty between St. Vincent and the United States, and therefore, his case should have been dismissed. However, Salazar's ineffectiveness claim is without merit, and we affirm the denial of this claim.

- 12 -

The United States Supreme Court in United States v. Alvarez-Machain, 504 U.S. 655, 657 (1992), held that "a criminal defendant, abducted to the United States from a nation with which it has an extradition treaty, [does not] thereby acquire[ ] a defense to the jurisdiction of this country's courts." Additionally,

> the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction." . . . They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

Serrano v. State, 64 So. 3d 93, 107-08 (Fla. 2011) (quoting Frisbie v. Collins, 342 U.S. 519, 522 (1952)).

Moreover, as the trial court concluded, Salazar was expelled from St. Vincent due to his suspicious behavior and having a falsified passport; Salazar was not illegally extradited. Thus, the claim that his extradition violates a treaty is without merit. Accordingly, because Salazar's claim is without merit, counsel was not ineffective for failing to raise it.

**2. Cross-examination of Codefendant Julius Hatcher**

Salazar also argues that trial counsel was ineffective for eliciting damaging testimony from Hatcher on cross-examination and permitting the State to introduce Hatcher's taped statements during a police investigation prior to trial. However,

- 13 -

because Salazar has failed to establish either the deficiency or prejudice prongs of Strickland, we affirm the denial of this claim.

First, Salazar has failed to demonstrate deficiency. Trial counsel testified that his strategy was to impeach Hatcher's story because it was "completely incredible," and Hatcher's demeanor and sound of his voice in his taped statement "actually increased [trial counsel's] argument that his story was absolutely incredible." Therefore, Salazar has failed to demonstrate that trial counsel's strategic decision was deficient. See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

Additionally, Salazar has not demonstrated prejudice. Even if trial counsel did not elicit the damaging testimony on cross-examination and as presented through Hatcher's taped statement as Salazar challenges, damaging testimony from Hatcher's direct examination would still have been presented to the jury. For example, Hatcher testified on direct examination that "[Salazar gave] me some duct tape and [told] me to tape up their ankles and their hands," then he put a "blue Wal-Mart bag around their head," and "put tape around their necks after I put the bag." Also, Hatcher testified on direct that Salazar told him to put the two individuals in separate rooms, and "[Salazar] told me to go in and shoot them . . .

- 14 -

to put a pillow over their head and shoot them." Therefore, there is not a reasonable probability that absent trial counsel's cross-examination of Hatcher and playing his recorded statement there would have been a different result. In other words, confidence in the outcome is not undermined.

Accordingly, because Salazar has failed to demonstrate deficiency and prejudice, we affirm the trial court's denial of relief.

## 3. Alibi Defense

Additionally, Salazar claims that trial counsel was ineffective for failing to investigate and present an alibi defense, namely that he was in Trinidad at the time of the murder. However, we affirm the denial of this claim.

First, Salazar has failed to demonstrate deficiency. As the postconviction trial court concluded in its order, regarding "the Trinidad alibi, evidentiary hearing testimony of trial counsel Russell Akins showed that counsel investigated the alibi before trial, found it to be false, and made a strategic decision not to present the Trinidad alibi defense." See Occhicone, 768 So. 2d at 1048. More specifically, trial counsel testified that after investigation, he found the date on the form indicating Salazar's presence in St. Vincent at the time of the crimes was a "scrivener's error on one of the jailing logs"; however, Salazar was actually in Florida on that date. Therefore, Salazar has failed to demonstrate that trial counsel was deficient.

Moreover, there is not a reasonable probability that presenting evidence that demonstrated a false alibi defense would have led to a different result. In other words, confidence in the outcome is not undermined.

Accordingly, because Salazar has failed to establish deficiency and prejudice, we affirm the trial court's denial of relief.

### D. Intellectual Disability

Salazar challenges the postconviction trial court's determination that he is not intellectually disabled. However, we affirm.

"Florida law includes a three-prong test for intellectual disability as a bar to imposition of the death penalty." Snelgrove v. State, 107 So. 3d 242, 252 (Fla. 2012). A defendant must establish intellectual disability by demonstrating the following three factors: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen. See Hurst v. State, 147 So. 3d 435, 441 (Fla. 2014) rev'd, Hurst v. Florida, 136 S. Ct. 616 (2016); § 921.137(1), Fla. Stat. The defendant has the burden to prove that he is intellectually disabled by clear and convincing evidence. Franqui v. State, 59 So. 3d 82, 92 (Fla. 2011); § 921.137(4), Fla. Stat. If the defendant fails to prove any one of these components, the defendant will not be found to be intellectually disabled. Nixon v. State, 2 So. 3d 137, 142 (Fla. 2009). In reviewing intellectual disability determinations, this Court

has employed the standard of whether competent, substantial evidence supports the trial court's determination. See Cherry v. State, 959 So. 2d 702, 712 (Fla. 2007); Brown v. State, 959 So. 2d 146, 149 (Fla. 2007) ("This Court does not reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses."). "However, to the extent that the [trial] court decision concerns any questions of law, we apply a de novo standard of review." Dufour v. State, 69 So. 3d 235, 246 (Fla. 2011).

In Hall v. Florida, 134 S. Ct. 1986 (2014), the United States Supreme Court invalidated Florida's interpretation of its statute as establishing a strict IQ test score cutoff of 70. Hall explained that "[a]n IQ score is an approximation, not a final and infallible assessment of intellectual functioning," and "[i]ntellectual disability is a condition, not a number." Id. at 2000, 2001. Accordingly, "[the Supreme Court] agrees with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 2001.

In this case, there was competent, substantial evidence to support the trial court's finding that Salazar is not intellectually disabled. First, competent, substantial evidence supports the conclusion that Salazar established the first element of an intellectual disability determination, which requires that the person

exhibit "significantly subaverage general intellectual functioning." § 921.137(1), Fla. Stat. Salazar's expert, Dr. Phillip Harvey, administered the Wechsler Adult Intelligence Scale (WAIS) III and IV. In 2008, Salazar scored a full scale IQ of 68 on the WAIS III, and in 2010, Salazar scored a full scale IQ of 67 on the WAIS IV. The State's expert, Dr. Greg Prichard, administered the Stanford-Binet Intelligence Scale 5 on Salazar in 2011, and Salazar scored a full scale IQ of 72. After considering the various criticisms regarding the administration of the tests, the postconviction trial court "[found] no evidence tending to undermine the WAIS administration, and the WAIS full scale IQ scores of 67 and 68[,] or to otherwise show that the Stanford-Binet score is more reliable than the WAIS scores," and concluded "that Salazar has demonstrated significant subaverage general intellectual functioning by clear and convincing evidence." Accordingly, based upon his IQ scores, competent, substantial evidence supports the trial court's finding that Salazar did meet the first element of significantly subaverage intellectual functioning.

Second, competent, substantial evidence supports the conclusion that Salazar failed to demonstrate concurrent deficits in adaptive behavior. See Dufour, 69 So. 3d at 248. As defined in section 921.137(1), the term adaptive behavior "means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural

- 18 -

group, and community." In properly examining whether the evidence supported or rebutted Salazar's alleged limitations, the trial court determined that a deficit in adaptive behavior did not exist and that evidence rebutted Salazar's alleged limitations.[3] Specifically, evidence demonstrated, and the trial court concluded, that Salazar demonstrated strengths in functional academics because he was able to comprehend the commercial driver's license manual and passed the test where only 40% of test takers pass the first time, understand and use legal references, and demonstrate competence to proceed pro se. Additionally, Salazar demonstrated strengths in self-care because he appeared well-groomed, dressed appropriately, and clean, he cared financially for himself, children, and family, maintained a bank account with $1,000 balance, understood the value of his personal assets, and could drive safely. Further, Salazar demonstrated strengths in self-direction by moving to the United States for a better life, traveling internationally between the United States and Trinidad, which requires a visa, fleeing to St. Vincent after the crime in disguise with a fake identification and passport, managing legal case strategy from jail, drawing a map of the crime area, directing the crimes and actions of others, representing himself in the courtroom concerning discovery, delays, indigency, and

3. Although the evidence at the evidentiary hearing did not support a finding of concurrent deficits in adaptive behavior, the deficits revealed at the evidentiary hearing provide support for ineffectiveness of counsel during the penalty phase, as discussed below.

consulate contacts, purchasing, selling, and paying taxes on real estate, making inmate requests for case resources, and paying for legal representation. Examining all of the record regarding Salazar's adaptive functioning, there is competent, substantial evidence to support the trial court's finding that Salazar does not meet the second element. See Dufour, 69 So. 3d at 244-53 (finding that despite IQ scores of 62, 67, and 74, Dufour failed to establish deficits in adaptive functioning because he was able to complete his GED and live independently, among other things).

Finally, there was competent, substantial evidence to support the trial court's finding regarding the age of manifestation. The United States Supreme Court explained that this prong requires that a defendant demonstrate that his "intellectual deficiencies manifested while he was in the 'developmental stage'— that is, before he reached adulthood." Brumfield v. Cain, 135 S. Ct. 2269, 2282 (2015). Salazar presented Dr. Frank Worrell at the evidentiary hearing, who did a retrospective evaluation of Salazar's academic functioning and social functioning prior to age eighteen by reviewing school records from Trinidad and interviewing Salazar's parents. Although Salazar may have been functioning at the lower ends of the academic distribution, he still did well enough on the common entrance exam in Trinidad to place in a secondary school, when not all students were guaranteed a placement, and received passing scores in almost all of his subjects.

Regarding his social functioning prior to age eighteen, Dr. Worrell found that Salazar was open, friendly, and able to care for himself. Accordingly, there is competent, substantial evidence to support the trial court's finding that Salazar failed to meet the third element of manifestation before age eighteen.

Accordingly, we affirm the trial court's denial of relief.

### E. Ineffective Assistance of Counsel During the Penalty Phase

Salazar also argues that trial counsel was ineffective for failing to investigate and present mitigation at the penalty phase. Specifically, Salazar contends that trial counsel should have introduced evidence of Salazar's low IQ scores of 67, 68, or 72, issues with adaptive functioning, and evidence of his family history and upbringing, such as being subject to physical abuse as a child and having sustained head injuries. The trial court concluded that Salazar demonstrated deficiency but "fail[ed] to demonstrate prejudice to the outcome of the penalty phase." At oral argument in this Court, the State conceded that trial counsel was deficient in regard to the penalty phase. We conclude that Salazar has demonstrated both the deficiency and prejudice prongs of Strickland, and we remand for a new penalty phase.

Penalty phase claims of ineffective assistance of counsel are reviewed under the two-prong test established by Strickland. First, to establish deficiency, the defendant carries the burden to prove that counsel's performance was unreasonable

under prevailing professional norms. Hoskins v. State, 75 So. 3d 250, 253-54 (Fla. 2011) (citing Duest v. State, 12 So. 3d 734, 742 (Fla. 2009)). "It is unquestioned that under the prevailing professional norms . . . counsel ha[s] an 'obligation to conduct a thorough investigation of the defendant's background.' " Porter v. McCollum, 558 U.S. 30, 39 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 396 (2000)). "Trial counsel cannot make a reasonable strategic decision when counsel does not 'conduct a thorough investigation of the defendant's background.' " Diaz v. State, 132 So. 3d 93, 110 (Fla. 2013) (quoting Sears v. Upton, 561 U.S. 945, 953 (2010)). Moreover, counsel must not "ignore[ ] pertinent avenues for investigation of which he should have been aware." Porter, 558 U.S. at 40.

Additionally, the defendant must demonstrate that he was prejudiced by trial counsel's failure to investigate and present mitigation. Hoskins, 75 So. 3d at 254. The defendant "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [postconviction] proceeding'—and 'reweig[h] it against the evidence in aggravation.' " Porter, 558 U.S. at 41 (quoting Williams, 529 U.S. at 397-98). A reasonable probability is a probability sufficient to undermine our confidence in the outcome. See id. at 43.

During the penalty phase, trial counsel called two witnesses, both were sisters of Salazar, to testify about Salazar's close relationship with his siblings and the love and support he provided to his family. However, trial counsel failed to meaningfully investigate and present at the penalty phase additional mitigating evidence. See Ragsdale v. State, 798 So. 2d 713, 716 (Fla. 2001) ("[A]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence.") (quoting State v. Riechmann, 777 So. 2d 342, 350 (Fla. 2000)).

Specifically, trial counsel failed to obtain any of Salazar's school records or medical records and failed to follow up with the one expert that he involved prior to the penalty phase. About a week before Salazar's trial was to begin, trial counsel consulted one expert, Dr. Harry Krop, a licensed psychologist, on only one occasion to conduct a mental health evaluation.[4] Subsequently, Dr. Krop conducted a preliminary evaluation of Salazar and sent a written report to trial counsel summarizing his evaluation. At the evidentiary hearing, Dr. Krop testified

---

4. Salazar separately claims that he did not receive an adequate mental health evaluation as required by Ake v. Oklahoma, 470 U.S. 68 (1985), and trial counsel was ineffective for failing to follow up on Dr. Krop's requests following his preliminary evaluation of Salazar before the penalty phase. However, because Salazar did not present an Ake claim on direct appeal, this claim is procedurally barred. Cherry v. State, 781 So. 2d 1040, 1047 (Fla. 2000) ("[T]he claim of incompetent mental health evaluation is procedurally barred for failure to raise it on direct appeal.").

that Salazar told him about head injuries he had in the past from accidents. Specifically, Dr. Krop testified that Salazar described to him a bicycle or auto accident he was involved in when he was ten, which resulted in injuries to his foot, back, arms, and head. Salazar remembered he had a loss of consciousness, and the accident caused him to be hospitalized for three months. Another accident Dr. Krop described at the evidentiary hearing resulted in Salazar having his left ear sliced and his left arm injured when he was a passenger in a vehicle at age twenty-one. Dr. Krop also testified that Salazar was having trouble sleeping, feeling claustrophobic, and experiencing depression and situational frustration.

After his initial evaluation, based on what Salazar told him, Dr. Krop thought that he would see Salazar again, and testified that "given the head injuries, I felt it was essential that further evaluation of possible organic brain damage be considered," and Dr. Krop "felt it was also important to find the medical records from—if possible, for when he had these accidents." Moreover, Dr. Krop testified that he requested additional information from trial counsel because he wanted to look further into Salazar's ability to function in a general population, explore his family support, determine whether the homicide was out of character for him, assess whether he had psychopathic traits, and explore possible organic brain damage. Specifically, Dr. Krop requested to review depositions, jail records, medical records, school records, and documents pertaining to prior criminal

charges. Dr. Krop also requested trial counsel coordinate interviews with relevant family members to get additional background information. Additionally, Dr. Krop requested that trial counsel schedule a follow-up evaluation with Salazar to administer neuropsychological testing. However, Dr. Krop never received any of these materials from trial counsel. In fact, Dr. Krop did not hear back from trial counsel and did not have any further involvement in Salazar's case.

The evidentiary hearing testimony of experts also included evidence of Salazar's low IQ, borderline intellectual functioning, and deficits in adaptive behavior. Although this evidence was not sufficient to prove Salazar is intellectually disabled as discussed above, this evidence was not presented at the penalty phase at all.

Specifically, the defense presented expert testimony at the evidentiary hearing. Salazar presented Dr. Harvey, a clinical psychologist, who gathered background information from Salazar before he conducted assessments, collected information about his family, and testified that Salazar "experienced a traumatic brain injury when being struck while riding a bicycle when he was a child in Trinidad." Dr. Harvey conducted the WAIS-III and WAIS-IV tests on Salazar, and he received a full scale IQ score of 67 or 68. Also, Dr. Harvey conducted the RBANS and Trail Making tests on Salazar to screen for possible neurological impairment. And Dr. Harvey testified that these tests indicated cognitive

deficiency and possible brain damage. Additionally, the State presented Dr. Prichard, a clinical psychologist, during the evidentiary hearing who administered the Stanford-Binet 5 on Salazar and found Salazar's full scale IQ score was 72. Dr. Harvey stated that his test scores were consistent with the State's expert's report "because they're within the same confidence interval of each other."

Additionally, there was evidentiary hearing testimony that Salazar had various deficits in adaptive functioning. Specifically, Dr. Thomas Oakland testified that he believed Salazar to be deficient in "functional academics, self-direction, and self-care." Additionally, Dr. Worrell corroborated that Salazar was deficient in functional academic skills, self-direction, and social skills, specifically with relation to self-care, gullibility, naïveté, and inability to protect himself. Dr. Worrell also investigated the Trinidad school system and concluded that Salazar demonstrated a consistent pattern of functioning at the lower ends of the academic distribution, and specifically, Salazar's scores on the common entrance exam placed him in the lowest of three tiers of secondary schools.

Testimony at the evidentiary hearing also revealed information about Salazar's family history and upbringing that was not presented at the penalty phase. For example, Salazar presented Gayle McGarrity, a cultural anthropologist, who testified to various aspects of Salazar's upbringing and family history, including the following: Salazar experienced a serious head injury when he fell off

a roof as a child, Salazar was able to be influenced by others very easily, Salazar's parents' divorce was traumatic and embarrassing for the family, Salazar's father had a gambling habit and was often away from the home, and his mother was a disciplinarian who administered beatings. Arlene Lambert, one of Salazar's sisters, also testified at the evidentiary hearing and described that there was a lot of hostility in the house leading up to their parents' divorce, and it was a stressful environment. She also described her recollection of when Salazar fell off a roof and landed onto concrete. Additionally, Sadie Francis, who was involved in a romantic relationship with Salazar for about five years, testified during the evidentiary hearing. She recalled that Salazar did not provide any form of financial assistance to his parents, and Salazar frequently missed appointments and even missed the birth of their child.

During the evidentiary hearing, trial counsel testified that his strategy for the penalty phase was to humanize Salazar, focusing on his loving relationships with his family. Trial counsel also testified that his investigations did not reveal any psychological disorder or any kind of head trauma. However, besides Dr. Krop's preliminary evaluation, trial counsel did not consider consulting any other kinds of expert witnesses in preparation for the penalty phase. Trial counsel did employ investigators to investigate issues related to the guilt phase, but their involvement

with the case was limited and trial counsel did not engage them to conduct any investigation or interviews for the penalty phase.

In Rutherford v. State, 727 So. 2d 216, 223 (Fla. 1998), we held that trial counsel was not deficient for relying on a strategy of "humanization" of the defendant rather than exposing his alcoholism and anxiety disorder. In reaching that holding, we drew a clear distinction between counsel's strategic decision after conducting a reasonable investigation prior to trial and those cases where counsel made a decision to forego mental mitigation without conducting any meaningful investigation. See id. For example, in Rose v. State, 675 So. 2d 567, 572-74 (Fla. 1996), we held that counsel's failure to investigate and present substantial mitigation evidence "deprived Rose of a reliable penalty phase proceeding" because trial counsel's mitigation decisions "[were] neither informed nor strategic" and "there was no investigation of options or meaningful choice." See also Phillips v. State, 608 So. 2d 778, 782-83 (Fla. 1992). In Rose, counsel failed to uncover mitigation evidence that Rose was a slow learner with an IQ of 84, he was severely injured in a 30-foot fall and suffered from organic brain damage, and he was emotionally abused and neglected throughout his childhood. Rose, 675 So. 2d at 571. Similarly, this Court granted a new penalty phase in Hurst v. State, 18 So. 3d 975, 1010-11 (Fla. 2009), where evidence was presented during postconviction proceedings that Hurst had a low IQ, had borderline intellectual functioning, and

information that Hurst's mother drank heavily when pregnant with him, suggesting the possibility of organic brain damage based on fetal alcohol syndrome. In Hurst, this Court concluded that counsel did not make an informed decision to ignore such mitigation and instead presented only insubstantial mitigation. Id. at 1012-13.

In the present case, trial counsel testified regarding his mitigation theory that he did not find any psychological disorder, any kind of head trauma, and actually found that "[Salazar] was a pretty normal fellow to talk to and deal with." However, the evidentiary hearing testimony revealed a significantly different background of Salazar and varying issues regarding Salazar's intellectual functioning. In fact, trial counsel was directly informed of such mental health problems and possible organic brain damage with a written report from Dr. Krop. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 539 U.S. 510, 527 (2003). Consequently, trial counsel's lack of investigation was not reasonable. See Parker v. State, 3 So. 3d 974, 985-86 (Fla. 2009) (reversing for a new penalty phase where counsel presented only "bare bones" mitigation at trial and substantial mental mitigation and mitigation concerning Parker's background were discovered and presented at the postconviction evidentiary hearing).

Accordingly, Salazar has demonstrated deficiency for failing to investigate Salazar's background and intellectual functioning. In fact, as stated previously, the State at oral argument conceded that trial counsel was deficient.

Regarding prejudice, "[t]his is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.' " Porter, 558 U.S. at 41 (quoting Strickland, 466 U.S. at 700). At the evidentiary hearing, it was established that the defendant had a low IQ score of 67, 68, or 72, that he functioned in the borderline range of intelligence with academic and behavioral problems, that he performed at the lower ends of the academic distribution in Trinidad, and that he sustained head injuries during his upbringing that may have led to organic brain damage. Weighing the mitigating evidence described above of Salazar's low IQ scores, adaptive deficits, head injuries, and family history presented during the postconviction proceeding, combined with the mitigating evidence presented at the penalty phase against the evidence in aggravation, there is a reasonable probability that presenting the additional mitigation would lead to a different result. Cf. Tanzi v. State, 94 So. 3d 482, 491 (Fla. 2012) ("The mitigating evidence adduced at the evidentiary hearing combined with the mitigating evidence presented at the penalty phase would not outweigh the evidence in aggravation as this case included six aggravating circumstances given

great and utmost weight."). In other words, confidence in the outcome is undermined.

Accordingly, because Salazar has established deficiency and prejudice, we remand for a new penalty phase.

### F. Cumulative Error

Salazar also claims that the cumulative effect of the various errors in his trial individually and cumulatively deprived him of a fundamentally fair trial and requires reversal of his guilt and penalty phase. "Where multiple errors are found, even if deemed harmless individually, 'the cumulative effect of such errors' may 'deny to defendant the fair and impartial trial that is the inalienable right of all litigants.' " Hurst, 18 So. 3d at 1015 (quoting Jackson v. State, 575 So. 2d 181, 189 (Fla. 1991)). "However, where the alleged errors urged for consideration in a cumulative error analysis are individually 'either procedurally barred or without merit, the claim of cumulative error also necessarily fails.' " Id. (quoting Parker v. State, 904 So. 2d 370, 380 (Fla. 2005)).

We have concluded that trial counsel was not ineffective during the guilt phase for failing to investigate Salazar's transport to the United States for trial, in the cross-examination of codefendant Hatcher, and failing to present an alleged alibi defense. Because we also conclude that these alleged guilt phase errors did not deprive Salazar of a fair trial cumulatively, we find no merit to Salazar's

cumulative error claim as to the guilt phase in this case. As to the penalty phase, we are remanding for a new penalty phase proceeding, thereby obviating the need to discuss cumulative error as to the penalty phase.

## III. HABEAS PETITION

### A. Failure to Raise Claims Regarding Cause Challenge to a Prospective Juror

In his habeas petition, Salazar claims that appellate counsel was ineffective for failing to present on direct appeal the claim that the trial court erred in denying defense counsel's cause challenge to Ms. W, a prospective juror who taught the victim's child and conceded bias and sympathy for this child, and believed the death penalty was warranted if the evidence of guilt against a defendant was strong. Salazar argues that the trial court's failure to grant trial counsel's for cause challenge was not harmless, and this constitutes reversible error. However, this claim is without merit because, under this Court's precedent, the challenge was not properly preserved.

During voir dire, prospective juror Ms. W indicated that she believed the death penalty was "generally appropriate with very few exceptions." However, she also agreed that she could follow the law even if that's different from her personal opinions, that "[she] would look at all the evidence as presented," and her decision to vote for death "would depend entirely on the evidence presented."

Additionally, Ms. W stated that she was a teacher and that a child in her

reading group was Ronze Cummings' child.[5]  She stated that she saw the child

about three times a week, and she would have special bias or sympathy for the

child.  Ms. W also stated she discussed the crimes with other teachers at the school

and knew that counselors came to the school to talk to the child.  However, Ms. W

stated her relationship with the family was professional, and she believed she could

be fair and impartial and listen to all of the evidence.

After this discussion, defense counsel moved to strike Ms. W for cause.  The

trial court denied the cause challenge reasoning that

> [Ms. W's] answers and her demeanor certainly to the [c]ourt were all
> consistent with where she should not be struck for cause; I mean, she
> gave the correct answers, she seemed to be confident in her decisions.
> She did have the child in her class, but said she couldn't remember
> what he looked like now or wouldn't recognize him because it's been
> so long, been five years, was in a reading class, I'm sure there were
> other kids there also, she has no preconceptions, said she believed she
> could be fair and impartial, wouldn't affect her, these are words she
> used, I'll deny—

Thereafter, the defense exercised one of its peremptory challenges to excuse

Ms. W.  After the defense exhausted all of its peremptory challenges, the defense

requested an additional peremptory challenge "[noting] for the record that the

[c]ourt earlier had denied a for-cause challenge from the [d]efense on Juror #3,

---

5. Although one of the Ronze Cummings' children (a two-year-old) was
present at the time of the crime, it is unclear whether this was the same child with
whom Ms. W was familiar.

[Mr. C, and the defense] was forced to use a peremptory strike on [Mr. C] as a result . . . If given an additional peremptory challenge, [the defense] would exercise that peremptory challenge as to [Ms. D] in Seat #33." The trial court granted this additional peremptory challenge.

Subsequently, the defense made a second request for an additional peremptory challenge, stating that "there was a for-cause challenge made as to [Ms. W] with regard to her extreme feelings on the death penalty, [but] that motion was denied. If given an additional peremptory challenge, we would exercise that challenge as to [Ms. G]." Again, the court acknowledged that "[Ms. W] had stated that the child of the victim of the alleged attempted first-degree murder was in her class three times a week for reading group during the year, she stated she has no preconceptions and can be fair and impartial." The State objected to the defense being allowed another peremptory challenge, arguing that the court had already granted an additional peremptory challenge and that the court was correct in denying the cause challenge to Ms. W. The trial court denied the defense's request for an additional peremptory challenge. Ms. G ultimately served on the jury.

Immediately after this discussion, the trial court proceeded to list all the jurors. The trial court named all the jurors, "to make sure we're all in agreement," and after naming each juror asked, "[a]ny objection?" The defense responded that "Defense agrees," and the State responded that the "State agrees." Thereafter, the

jury was sworn without the defense raising another objection or renewing a prior objection.

Claims of ineffective assistance of appellate counsel are appropriately raised in a petition for writ of habeas corpus. See Freeman v. State, 761 So. 2d 1055, 1069 (Fla. 2000). Consistent with the Strickland standard, in order to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine:

> first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986); see also Dennis, 109 So. 3d at 701.

In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So. 2d at 1069 (citing Knight v. State, 394 So. 2d 997, 1001 (Fla. 1981)). "[C]laims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been raised on direct appeal or in a postconviction motion." Rutherford v. Moore, 774 So. 2d 637, 643 (Fla. 2000). And "[i]f a legal issue 'would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate

- 35 -

counsel's performance ineffective." Id. (quoting Williamson v. Dugger, 651 So. 2d 84, 86 (Fla. 1994)). "In fact, appellate counsel is not necessarily ineffective for failing to raise a claim that might have had some possibility of success; effective appellate counsel need not raise every conceivable nonfrivolous issue." Valle v. Moore, 837 So. 2d 905, 908 (Fla. 2002) (emphasis in original); see also Provenzano v. Dugger, 561 So. 2d 541, 549 (Fla. 1990) ("[I]t is well established that counsel need not raise every nonfrivolous issue revealed by the record.").

"Under our cases, the preservation of a challenge to a potential juror requires more than one objection." Carratelli v. State, 961 So. 2d 312, 318 (Fla. 2007). Specifically, "to preserve challenges for cause to prospective jurors, the defendant must 'object to the jurors, show that he or she has exhausted all peremptory challenges and requested more that were denied, and identify a specific juror that he or she would have excused if possible.' " Matarranz v. State, 133 So. 3d 473, 482 (Fla. 2013) (quoting Kearse v. State, 770 So. 2d 1119, 1128 (Fla. 2000)). And "[w]hen a trial court denies or grants a peremptory challenge, the objecting party must renew and reserve the objection before the jury is sworn." Carratelli, 961 So. 2d at 318. "By not renewing the objection prior to the jury being sworn, it is presumed that the objecting party abandoned any prior objection he or she may have had and was satisfied with the selected jury." Id. (quoting Zack v. State, 911 So. 2d 1190, 1204 (Fla. 2005)). Moreover, if counsel "affirmatively accept[s] the

jury immediately prior to its being sworn without reservation of his earlier-made objection, . . . counsel's action in accepting the jury [leads] to a reasonable assumption that he had abandoned, for whatever reason, his earlier objection." Joiner v. State, 618 So. 2d 174, 176 (Fla. 1993). The purpose for this rule is "to provide a trial court with notice that counsel believes a juror has been retained in error, and to provide the court with a final opportunity to redress the situation." Matarranz, 133 So. 3d at 483; see also Trotter v. State, 576 So. 2d 691, 693 (Fla. 1990) (noting that the requirements for the preservation of a challenge to a potential juror exist so that "[t]he defendant cannot stand by silently while an objectionable juror is seated and then, if the verdict is adverse, obtain a new trial").

In Carratelli, 961 So. 2d at 315, this Court "explain[ed] the standard that courts should apply in deciding whether a trial counsel's failure to preserve a challenge to a potential juror constitutes ineffective assistance of counsel." Specifically, this Court explained that to meet the prejudice prong of Strickland, "the defendant must demonstrate that a juror was actually biased." Id. at 324. "[A]ctual bias means bias-in-fact that would prevent service as an impartial juror." Id. "[E]vidence of bias must be plain on the face of the record." Id.

In this case, the juror issue was not preserved because trial counsel did not renew his objection before the jury was sworn and, in fact, expressly agreed with the selected jurors. During voir dire, the defense objected to Ms. W, but his cause

- 37 -

challenge was denied.  Subsequently, the defense used one of its peremptory challenges to excuse Ms. W.  After the defense exhausted all of its peremptory challenges, counsel requested an additional peremptory challenge to excuse Ms. W and identified a specific juror, Ms. G, that he would have excused if possible.  However, this request was denied.  After the selected jurors were named, and the trial court asked, "[a]ny objection?," the defense did not renew its objection to Ms. W, but rather expressly stated that the "Defense agrees" with the selected jurors.  Therefore, because the defense did not renew his objection to Ms. W prior to the jury being sworn, the defense abandoned any prior objection he had and was satisfied with the selected jury.  See Joiner, 618 So. 2d at 176.  In other words, the challenge was not properly preserved and appellate counsel was not ineffective for failing to raise this issue on direct appeal.

Additionally, assuming that a defendant must demonstrate the same prejudice standard when raising an ineffective assistance of appellate counsel claim as when raising an ineffective assistance of trial counsel claim, Salazar did not claim and failed to show that an actually biased juror served on the jury.  Based on the trial court's denial of the for cause challenge made as to Ms. W, trial counsel requested an additional peremptory challenge to dismiss Ms. G.  However, the trial court denied the defense's request, and Ms. G ultimately served on the

jury.  But Salazar does not claim and has failed to demonstrate that a biased venire person actually served on the jury.  See Carratelli, 961 So. 2d at 324.

To summarize, we hold that the challenge was not preserved because trial counsel failed to renew his objection before the jury was sworn and in fact expressly waived any prior objection by stating, "Defense agrees."  Additionally, Salazar failed to claim or show that a biased juror actually served on the jury.  Therefore, appellate counsel was not ineffective for failing to raise this claim, and we deny relief.

### B.  Failure to Raise Claims Regarding Prosecutor's Comments

Salazar also claims in his habeas petition that appellate counsel was ineffective for failing to challenge on direct appeal multiple, allegedly improper statements made by the prosecution during closing arguments.  More specifically, Salazar argues that the prosecution improperly shifted the burden of proof by suggesting to the jury that Salazar had to prove that the State's two main witnesses were lying.  However, this claim is without merit.

"[I]t is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt."  Gore v. State, 719 So. 2d 1197, 1200 (Fla. 1998).  However, "[t]o preserve such a claim for appeal, trial counsel must contemporaneously object to the prosecutor's comments."  Davis v.

State, 136 So. 3d 1169, 1202 (Fla. 2014). "Unobjected-to comments are grounds for reversal only if they rise to the level of fundamental error." Id. (quoting Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007)). "The Court considers the cumulative effect of objected-to and unobjected-to comments when reviewing whether a defendant received a fair trial." Merck, 975 So. 2d at 1061 (citing Brooks v. State, 762 So. 2d 879, 898-99 (Fla. 2000)).

In this case, the prosecution's comments regarding the jury determining if the State's two main witnesses were lying were directed at the defense's theory of the case that Salazar was not present at the crime. While a prosecutor may "not ridicule or otherwise improperly attack the defense's theory of the case," a prosecutor is permitted to suggest to the jury that "based on the evidence of the case, they should question the plausibility of the defense's theory." Valentine v. State, 98 So. 3d 44, 55-56 (Fla. 2012). Accordingly, with one possible exception, these statements questioning the plausibility of the defense's theory were appropriate. The prosecution's statement "that this is all some kind of a, you know, fantasy here" is arguably "needless sarcasm." Gore, 719 So. 2d at 1201; see also Izquierdo v. State, 724 So. 2d 124, 125 (Fla. 3d DCA 1998) (concluding reference to a defense as a "pathetic fantasy" was improper).

However, trial counsel did not contemporaneously object to the prosecutor's comments. Accordingly, a claim based on these comments would succeed only if

the improper comments resulted in fundamental error.  See Davis, 136 So. 3d at 1202.  Fundamental error is error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty . . . could not have been obtained without the assistance of the alleged error." Card v. State, 803 So. 2d 613, 622 (Fla. 2001). Here, when considered against the weight of all the other evidence presented, the comments " 'did not go to the heart of the case' [and] were not critical to the jury's verdict." Davis, 136 So. 3d at 1204 (quoting Braddy v. State, 111 So. 3d 810, 843-44 (Fla. 2012)).  Accordingly, these comments do not constitute fundamental error, and appellate counsel was not ineffective in failing to challenge them.  Freeman, 761 So. 2d at 1070 ("Appellate counsel cannot be ineffective for failing to raise an issue which is without merit.").

Therefore, we deny relief.

## IV. CONCLUSION

For the foregoing reasons, we remand for a new penalty phase and deny Salazar's habeas petition.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Okeechobee County,
	Sherwood Bauer, Jr., Judge - Case No. 472000CF000368CFAXMX
And an Original Proceeding – Habeas Corpus

Richard Adam Sichta and Joseph Stewart Hamrick of The Sichta Firm, LLC.,
Jacksonville, Florida,

	for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Leslie T. Campbell,
Assistant Attorney General, and Katherine Yzquierdo McIntire, Assistant Attorney
General, West Palm Beach, Florida,

	for Appellee/Respondent