# Supreme Court of Florida

_____

No. SC19-1587

_____

**STATE OF FLORIDA,**

Appellant/Cross-Appellee,

vs.

**KHADAFY KAREEM MULLENS,**

Appellee/Cross-Appellant.

August 31, 2022

PER CURIAM.

The State of Florida appeals and Khadafy Kareem Mullens cross-appeals the postconviction court's order partially granting Mullens's motion to vacate his first-degree murder convictions and sentences of death pursuant to Florida Rule of Criminal Procedure 3.851.[1]  For the reasons given below, we reverse the granting of a new penalty phase but affirm in all other respects.

---

1.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.

## I.   BACKGROUND

The crimes giving rise to this case occurred at a convenience store in Pinellas County and were recorded by the store's surveillance cameras.  As seen on the surveillance footage, Mullens and Spencer Peeples entered the store together in the early evening. Mullens approached the front counter where he made contact with the store's owner, Mohammed Uddin.  Moments later, after obtaining items in the store, Peeples joined Mullens at the front counter.

Mullens then walked to the store's main entrance where he maintained focus on Uddin.  While Mullens was at the main entrance, Peeples began threatening Uddin with a loaded revolver. In response, Uddin fell backwards and attempted to hide behind the front counter.  Mullens and Peeples immediately went behind the front counter and demanded that Uddin give them money from the register.

While Uddin was in the process of opening the register, Ronald Hayworth entered the store and approached the front counter. Despite Hayworth's presence, Peeples continued taking money from the register.  After clearing the register, Peeples and Mullens asked

Uddin about nearby VCR equipment (which was then inoperable). Peeples removed the VCR equipment, later handing it to Mullens.

Mullens and Peeples then demanded Uddin's car keys. When Uddin did not immediately comply, Mullens and Peeples took turns threatening him with the revolver while the other gathered additional items from the store—including lottery tickets. Eventually, Uddin gave up his car keys.

With Uddin's car keys and two bags of stolen items, Peeples exited the store. Mullens, however, remained inside. Armed with the revolver, Mullens alternated between looking through the doors and monitoring the store. Eventually, Mullens opened the door and leaned outside. From Uddin's perspective, it appeared as though Mullens had left the store. Seizing upon this perceived opportunity, Uddin picked up the phone located behind the front counter and began making a call.

As Uddin was making the call, Mullens shut the door and noticed Uddin holding the phone. He walked over to Uddin, pointing the revolver at Uddin's head. As he neared Uddin, Uddin screamed and sought to direct the firearm away from his face, which gave rise to a brief struggle. Despite Uddin's resistance,

Mullens was able to point the revolver directly at Uddin's face and pull the trigger. The bullet struck Uddin in the face, killing him almost instantly. Uddin slumped over and fell to the floor.

After killing Uddin, Mullens turned his attention to Hayworth, who had remained in the store but was not in any way blocking Mullens's ability to leave. Mullens walked over to Hayworth, grabbed him, slammed him onto the floor, and then shot him in the face from nearly point-blank range—killing him. At no point during the entire episode did Hayworth confront or resist Mullens or Peeples.

Mullens then proceeded to the main entrance. As Mullens neared the doors, a would-be patron, Albert Barton, started to enter the store. Sensing something was amiss, Barton attempted to backtrack, but Mullens pulled him into the store. A struggle ensued during which Mullens's revolver malfunctioned. Nevertheless, despite the issues with the revolver, Mullens managed to fire it three times, hitting Barton once in the head. Unlike Uddin and Hayworth, Barton survived the brutal attack.

After shooting Barton, Mullens calmly gathered the stolen items—including the lottery tickets—and left the store. He then

entered Uddin's vehicle which Peeples had since relocated, and the two left the scene just moments before law enforcement arrived.

Later that day, with the benefit of the store's surveillance video, law enforcement issued a BOLO,[2] which included a description of Mullens, Peeples, and the stolen car. Mullens was arrested the following morning. Immediately prior to his arrest, Mullens discarded some of the stolen lottery tickets.

Ultimately, the State charged Mullens with two counts of first-degree murder and one count of attempted first-degree murder. For the two counts of first-degree murder, the State sought the death penalty.

Thereafter, Mullens asked the trial court to declare him incompetent to proceed. At a hearing spanning several days, the court heard the testimony of Mullens's retained expert, Dr. Scot Machlus, and two court-appointed experts, Dr. Jill Poorman and Dr. Peter Bursten. For her part, Dr. Poorman testified that Mullens was fully competent and that he was feigning symptoms in order to

---

2. BOLO stands for "be on the lookout."

benefit himself. Crediting that testimony, the court found Mullens competent to proceed.

Eventually, after many discussions with his family and counsel, Mullens pled guilty to the charged crimes and waived a penalty-phase jury. At a hearing on those issues, the court asked Mullens questions related to his understanding of the charges, the posture and nature of the case, his decision to plead guilty, and the effect of waiving a penalty-phase jury. Satisfied with Mullens's responses, the court accepted the guilty pleas and jury waiver.

At the ensuing penalty phase, the State called several witnesses, including law enforcement officers and a medical examiner. In addition, the State introduced surveillance videos and still pictures from the convenience store as well as judgments and sentences documenting Mullens's prior violent felony convictions.[3]

After the State rested, Mullens presented mitigating evidence. He called a number of friends and family who spoke of his difficult childhood, poor performance in school, below-average intelligence,

---

3. The judgments and sentences included convictions for attempted burglary, resisting an officer with violence, aggravated battery, and battery on a law enforcement officer.

behavioral issues, and mental illnesses within his family. In addition, Mullens called Dr. Machlus as an expert witness. Consistent with past diagnoses by other professionals, Dr. Machlus opined that Mullens has bipolar I disorder (mixed). He also diagnosed Mullens with a personality disorder (unspecified) and polysubstance dependency. Based on the foregoing, he opined that Mullens's capacity to conform to the law's requirements was substantially impaired and that Mullens was experiencing an extreme emotional or mental disturbance at the time of the crimes.

Ultimately, the trial court sentenced Mullens to death for each murder. In its sentencing order, the court found three aggravating factors, namely: (1) Mullens had been convicted of prior violent felonies, which included the contemporaneous murders of Uddin and Hayworth and the attempted murder of Barton; (2) Mullens committed the murders while in the course of a robbery; and (3) Mullens committed the murders to avoid arrest. To each aggravating circumstance, the court assigned great weight. As for mitigating circumstances, the court found two statutory ones—Mullens's ability to conform to the law was substantially impaired at the time of the murders and he was also acting under an extreme

emotional disturbance. The court assigned moderate weight to each circumstance. In addition, the court found six consolidated nonstatutory mitigating circumstances, assigning weight ranging from little to some. The court, however, rejected the proposed mitigating circumstance that Mullens was sexually abused by his stepfather and prison inmates. According to the court, the greater weight of the evidence did not support the sexual-abuse allegations. Ultimately, the court concluded that the aggravating circumstances "far outweigh[ed] the mitigating circumstances, which fail[ed] to reach the magnitude of the aggravating factors."

Mullens appealed, raising several arguments for our review. *Mullens v. State*, 197 So. 3d 16, 25-40 (Fla. 2016). We rejected all arguments directed at the penalty phase except one. Specifically, we concluded that insufficient evidence supported the avoid-arrest aggravator related to Uddin. *Id.* at 29. Nevertheless, we upheld that aggravator as to Hayworth. *Id.* We further held that *Hurst v. State*, 202 So. 3d 40, 43 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020), did not apply to Mullens since he waived a penalty-phase jury. 197 So. 3d at 39-40. Ultimately, finding Mullens's plea to be knowing, intelligent, and voluntary, *id.*

at 35-37, we affirmed the judgments and sentences of death and remanded for the sole purpose of entering a written order of competency, *id.* at 40.

After the Supreme Court denied his petition for certiorari, *Mullens v. Florida*, 137 S. Ct. 672 (2017), Mullens filed a postconviction motion under rule 3.851, which he later amended. In the amended motion, Mullens raised three claims of ineffective assistance of counsel, an intellectual-disability claim, a claim of cumulative error, and four purely legal claims.

Following a *Huff*[4] hearing, the postconviction court summarily denied the four purely legal claims. But it granted a hearing on all remaining claims except for the cumulative-error claim for which the court reserved a ruling. After the evidentiary hearing,[5] the court entered the order now under review. In that order, the court granted a new penalty phase based on a finding that counsel was deficient in investigating and presenting mitigating evidence, which

---

4. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

5. Dr. Machlus did not testify at the hearing.

prejudiced Mullens. It, however, denied the balance of the pending claims. The State now appeals, and Mullens cross-appeals.

## II.    APPEAL

The State challenges the postconviction court's decision to grant a new penalty phase. According to the State, that ruling contravenes several legal principles and is not supported by the record in certain respects. We agree. In reaching this conclusion, we discuss background legal principles, summarize the grounds upon which the court granted relief, and explain why none of the grounds support the court's ruling.

### A. Background Principles

"The Sixth Amendment guarantees 'the right to the effective assistance of counsel' " at all critical phases, *Dilang Dat v. United States*, 983 F.3d 1045, 1047 (8th Cir. 2020) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)), including the penalty phase of a death penalty proceeding, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "Penalty phase claims of ineffective assistance of counsel are reviewed under the two-prong test established by *Strickland*." *Salazar v. State*, 188 So. 3d 799, 814 (Fla. 2016).

Thus, to succeed on a penalty-phase claim, a defendant must prove both deficient performance and prejudice:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

*Brown v. State*, 304 So. 3d 243, 257 (Fla. 2020) (quoting *Bolin v. State*, 41 So. 3d 151, 155 (Fla. 2010)).

As for performance, "an attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." *Valentine v. State*, 98 So. 3d 44, 53 (Fla. 2012) (quoting *State v. Riechmann,* 777 So. 2d 342, 350 (Fla. 2000)). "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Salazar,* 188 So. 3d at 817 (quoting *Wiggins,* 539 U.S. at 527).

Moreover, in discussing counsel's duty to investigate, we and other courts have made clear that counsel is entitled to rely on a

- 11 -

qualified expert's opinion, and that such reliance is not rendered unreasonable just because a new expert in postconviction proceedings disagrees with trial counsel's expert. *See Brant v. State*, 197 So. 3d 1051, 1069 (Fla. 2016) ("[W]e have repeatedly stated that trial counsel is not deficient because the defendant is able to find postconviction experts that reach different and more favorable conclusions than the experts consulted by trial counsel."); *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) ("Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so." (quoting *Smith v. Cockrell*, 311 F.3d 661, 675-76 (5th Cir. 2002), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004))). And, more generally, we have stressed that when assessing performance under *Strickland*, "there is a 'strong presumption' that trial counsel's performance 'falls within the wide range of reasonable professional assistance.'" *Brown*, 304 So. 3d at 257 (quoting *Strickland*, 466 U.S. at 689).

Turning to prejudice—specifically prejudice in the penalty-phase context—a defendant must demonstrate that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Sochor v. State*, 883 So. 2d 766, 771 (Fla. 2004) (quoting *Strickland*, 466 U.S. at 695). In making that assessment, we consider the totality of the mitigating evidence—presented at both the penalty phase and evidentiary hearing—and reweigh it against the aggravating evidence. *Brooks v. State*, 175 So. 3d 204, 230 (Fla. 2015). Accordingly, we view "the sentence of death in the context of the penalty phase evidence, the mitigating and aggravating circumstances found, and the previously undiscovered postconviction evidence." *State v. Bright*, 200 So. 3d 710, 734 (Fla. 2016) (citing *Hurst v. State*, 18 So. 3d 975, 1013 (Fla. 2009)).

On appeal of a postconviction court's ruling on a *Strickland* claim, we apply a mixed standard of review. *See Martin v. State*, 311 So. 3d 778, 792 (Fla. 2020). We accept the court's factual findings to the extent they are supported by competent substantial evidence. *Id.* Our deference to supported factual findings does not

extend to the postconviction court's ultimate conclusions on the deficient performance and prejudice prongs. *See King v. State*, 260 So. 3d 985, 994 (Fla. 2018) (deference only given to "*factual findings*" (quoting *Eaglin v. State*, 176 So. 3d 900, 906 (Fla. 2015)); *Bruno v. State*, 807 So. 2d 55, 62 (Fla. 2001) (characterizing determinations of deficient performance and prejudice as "ultimate conclusions" of law). In assessing those conclusions, our review is de novo. *See Bruno*, 807 So. 2d at 62.

## B. The Postconviction Court's Ruling

The postconviction court gave several reasons for finding counsel's performance to be deficient. It found counsel deficient for presenting only speculative evidence that Mullens had been sexually abused by his stepfather and prison inmates. In addition, the court stressed that counsel had failed to seek neuropsychological testing and overlooked evidence and indicators of FASD,[6] PTSD, brain damage, and possible intellectual disability. The court also faulted counsel for failing to adequately supervise Dr. Machlus and presenting an incoherent narrative during the

---

6. FASD stands for fetal alcohol spectrum disorder.

- 14 -

penalty phase. We address each basis, holding that none supports the legal conclusion that counsel was deficient.

### C. Deficient Performance

*(1)Sexual Battery*

In finding counsel deficient for presenting only speculative evidence of sexual battery, the postconviction court relied solely on the testimony of two experts retained during postconviction proceedings—Dr. Michael Maher (a psychiatrist) and Dr. Robert Ouaou (a neuropsychologist). Both testified that they *believed* Mullens's sexual-abuse allegations, stressing the masturbation-like motion he made while discussing the alleged incidents.

We conclude that the postconviction court legally erred in finding deficient performance based on the testimony of Mullens's two experts. Both Dr. Machlus and the two postconviction experts based their sexual-abuse opinions on assessments of Mullens. Of significance, the postconviction court did not identify any objective evidence available to trial counsel that would have corroborated the sexual-battery allegations or that should have been provided by counsel to Dr. Machlus so that he could have given more effective testimony on this subject. Thus, the court essentially faulted

counsel for not finding experts who could have offered more favorable testimony than Dr. Machlus based on the same source of information that Dr. Machlus consulted. However, we have repeatedly held that counsel is not deficient simply because postconviction counsel secures a more favorable expert. *See Valentine*, 98 So. 3d at 53; *Hoskins v. State*, 75 So. 3d 250, 255 (Fla. 2011). We further note that the testimony of Mullens's experts was no less speculative than Dr. Machlus's penalty phase testimony, which the trial court did not credit.

### (2)PTSD, Possible Intellectual Disability, FASD and Traumatic Brain Damage

At the evidentiary hearing, Dr. Maher opined that Mullens suffers from PTSD, FASD, and possibly traumatic brain injury. For his part, Dr. Ouaou testified that he conducted a neuropsychological evaluation of Mullens—the result of which informed his conclusion that Mullens was intellectually disabled and showed signs of brain damage. The postconviction court relied heavily on those opinions in finding counsel deficient. However, in doing so, the court contradicted the principle that counsel is entitled to rely on a qualified expert even when postconviction

experts later disagree with that expert's opinion. *See Brant*, 197 So. 3d at 1069.

Here, trial counsel retained Dr. Machlus, an experienced and well-trained psychologist, to assist in developing mitigating evidence. Dr. Machlus has a master's degree and a doctorate in psychology, is licensed in Florida and New York, is board certified, has been practicing since 1988, and is published. In addition, Dr. Machlus was highly recommended to counsel.[7] Accordingly, the record demonstrates that Dr. Machlus was a qualified expert upon whom counsel was entitled to rely in tailoring a penalty-phase strategy.

Dr. Machlus reviewed voluminous records, spoke with Mullens at least 12 times, interviewed close family members, and conducted various tests involving Mullens. Based on that exhaustive work, Dr. Machlus concluded that Mullens suffered from bipolar disorder, a personality disorder, and polysubstance dependency. However, Dr. Machlus ruled out other potential causes for Mullens's criminal conduct, like PTSD. And, consistent with counsel's strategy, Dr.

---

7. After observing Dr. Machlus's testimony at the competency hearing, the trial court observed, "I think he's a solid professional."

- 17 -

Machlus gave testimony at the penalty phase which provided the basis for two statutory mitigators—giving moderate weight to each—and helped establish three consolidated nonstatutory factors.

As noted above, in finding deficient performance, the court relied on a postconviction diagnosis of PTSD rendered by Dr. Maher. But such reliance is misplaced. Dr. Machlus expressly determined that Mullens did not suffer from PTSD. Trial counsel was entitled to rely on that determination, notwithstanding the fact that Dr. Maher later reached a contrary conclusion. *See Brant*, 197 So. 3d at 1069; *Valentine*, 98 So. 3d at 53; *Darling v. State*, 966 So. 2d 366, 377 (Fla. 2007).

Similarly, the court's reliance on possible intellectual disability is misplaced. After performing the WAIS IV test,[8] Dr. Machlus determined that Mullens had an IQ of 83. That result would have been a significant, if not insurmountable, obstacle to success on an intellectual-disability claim. *See Haliburton v. State*, 331 So. 3d 640, 652 (Fla. 2021) (characterizing first prong of intellectual disability test—i.e., significantly subaverage general intellectual

---

8. WAIS stands for Wechsler Adult Intelligence Scale.

functioning—as "threshold" and "independent" requirement not to be "cast aside in the name of 'holistic review' " (quoting *Walls v. State*, 213 So. 3d 340, 350 (Fla. 2016) (Canady, J., dissenting)); *Franqui v. State*, 301 So. 3d 152, 154 (Fla. 2020) ("If the defendant fails to prove any one of the[] components [of an intellectual-disability claim], the defendant will not be found to be intellectually disabled." (quoting *Salazar*, 188 So. 3d at 812)). Again, counsel was entitled to rely on that determination concerning Mullens's general intellectual functioning. *See Valentine*, 98 So. 3d at 53; *Darling*, 966 So. 2d at 377. Indeed, even postconviction counsel conceded below: "[W]e cannot in good faith allege that the trial attorneys were ineffective for [not] raising [the claim] . . . because they had a defense expert that gave them the IQ of 83 that--and they are reasonably allowed to rely on that expert's opinion. That's what the law says." And, although Dr. Ouaou questioned the validity of the IQ test, the record does not demonstrate that trial counsel had an objective basis for questioning the validity of Dr. Machlus's test administration.[9]

---

9. We acknowledge a prior low IQ score from Mullens in the record. But, in light of higher scores on comparable tests, a

- 19 -

As to FASD and brain damage, the court faulted counsel for failing to retain a neuropsychologist to perform neuropsychological testing on Mullens. However, that criticism again ignores the analysis and conclusions rendered by Dr. Machlus and Dr. Michael Gamache[10]—analysis on which counsel was entitled to rely under our case law. Dr. Gamache, a neuropsychologist, reviewed voluminous records related to Mullens and personally examined him—but did not ultimately testify at the penalty phase. For his part, Dr. Machlus conducted extensive testing, interviewed Mullens at least 12 times, and even spoke with Mullens's family members. The record reveals that Dr. Machlus was made aware of the allegations of Mullens's mother drinking during her pregnancy with him. And the record also reveals that Dr. Machlus and Dr. Gamache spoke with individuals—including Mullens—who had (or would have had) knowledge of the alleged undocumented head

retained expert's stated belief that the score was low due to Mullens's lack of cooperation, and Mullens's documented history of malingering, we do not think that the low score renders unreasonable counsel's express reliance on the result of the IQ test administered by Dr. Machlus.

10. Mullens does not seek to undermine Dr. Gamache's credentials or qualifications.

trauma. Ultimately, both experts offered various views on Mullens—including those contained in a thorough report by Dr. Machlus. But, in the final analysis, neither expert recommended that Mullens undergo neuropsychological testing. Counsel was entitled to rely on their assessments in developing its mitigation strategy and cannot be deemed deficient for not requesting additional testing. *See Valentine*, 98 So. 3d at 53; *Darling*, 966 So. 2d at 377.

We have not overlooked (1) Mullens's lead attorney's testimony that she was somewhat confused as to Dr. Machlus's background, (2) a note indicating that Dr. Gamache thought that Mullens might have frontal lobe impairment, (3) an unexplained attorney note suggesting that Mullens did not have a history of head trauma, and (4) the retained mitigation specialist's testimony expressing disagreement with some of Dr. Machlus's views on mitigation. Quite simply, none of this evidence undermines the unrebutted evidence that Dr. Machlus and Dr. Gamache were qualified competent experts on whom counsel was entitled to rely in

- 21 -

investigating and presenting mitigating evidence.[11]  Nor, in our

view, is that evidence sufficient to render such reliance

unreasonable.[12]

This leads us to what we discern as the dissent's primary

criticism of our analysis.  According to the dissent, we have

disregarded the postconviction court's findings—findings that are

supported by competent substantial evidence.  In doing so, asserts

the dissent, we have overlooked the well-settled standard of review.

We do not think this criticism is well founded.

Except for the postconviction court's findings related to the

sexual-battery ground—which we found speculative in part—we

have not questioned the accuracy of the postconviction court's

---

11.  The postconviction court noted that Dr. Machlus was the sole expert who testified for the defense at the penalty phase.  The court did not cite, nor has Mullens called our attention to, any decision holding counsel deficient for presenting only one expert witness.

12.  Although the postconviction experts' diagnoses appear consistent with the mitigation specialist's concerns and recommendations, that consistency does not support a determination of deficient performance.  When assessing counsel's performance, our focus is on the circumstances existing at the time of the challenged conduct without resort to hindsight.  *See Dennis v. State,* 109 So. 3d 680, 690 (Fla. 2012).

expansive summary of the evidence presented at the hearing. Instead, as stated elsewhere, we have concluded that the court legally erred when it determined that Mullens had demonstrated deficient performance—an error stemming from its failure to recognize the significance of the undisputed fact that trial counsel hired qualified experts to assist in developing the mitigation strategy and that counsel relied on those experts. To this point, nowhere in its order did the postconviction court acknowledge the principle that counsel is entitled to rely on qualified experts in developing and presenting mitigating evidence—a principle firmly embedded in our case law.[13] The court's error in this regard is not lessened by its expansive factual summary.

_____

13. Consistent with its failure to state or apply this principle, the postconviction court never found that Dr. Machlus was not a qualified competent expert. Instead, the postconviction court focused on the differences between the views of Dr. Machlus and those of the postconviction experts—favoring the latter's analysis. Rather than rely on differences of that sort, our cases have focused on the reasonableness of counsel's reliance on the experts that trial counsel actually retained. *See Brown*, 304 So. 3d at 269; *Brant*, 197 So. 3d at 1069; *Hernandez v. State*, 180 So. 3d 978, 1013 (Fla. 2015).

*(3)Failure to Adequately Supervise Dr. Machlus*

The postconviction court also ruled that counsel should have better supervised Dr. Machlus, who did not have prior experience in capital cases.[14]  We disagree.  In reaching this holding, we find the following rationale, as articulated by a federal appeals court, persuasive:

> If an attorney has the burden of reviewing the trustworthiness of a qualified expert's conclusion before the attorney is entitled to make decisions based on that conclusion, the role of the expert becomes superfluous.
>     . . . .
>     . . . By forcing lawyers to second-guess their experts, the position Hendricks argues would effectively eliminate the legitimate role experts play in guiding and narrowing an attorney's investigation.

*Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995).

*(4)Incoherent Narrative*

In addition, the postconviction court also stressed that counsel failed to present a cohesive narrative.  The court did not explain how counsel's narrative was disjointed.  That unexplained

---

14.  Like the postconviction court, the dissent also notes that Dr. Machlus did not have prior experience in death-penalty cases.  However, neither the dissent nor Mullens has cited any case suggesting that this circumstance would render unreasonable counsel's reliance on Dr. Machlus.

finding aside, we have independently reviewed the penalty-phase transcript and the written closing arguments. Based on that review, we find that trial counsel's chosen narrative comports with objective standards of reasonableness. *See Sheppard v. State*, 338 So. 3d 803, 816 (Fla. 2022) (discussing *Strickland* requirement that defendant prove that challenged action falls below objective bounds of reasonableness under prevailing norms). Counsel put on evidence of Mullens's difficult childhood, below average intelligence, poor scholastic performance, and mental-health and substance-abuse issues. The narrative included compelling testimony from Mullens's mother. In short, the narrative was sensible, coherent, and effective in that it resulted in the finding of two statutory and six consolidated nonstatutory mitigating circumstances. To the extent Mullens argues that trial counsel should have placed greater stress on the timing of Mullens's stepfather's death (which occurred shortly before the murders), that argument lacks merit. *See Harrington v. Richter*, 562 U.S. 86, 109 (2011) ("There is a '*strong presumption*' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.' "

(emphasis added) (quoting *Yarborough v. Gentry,* 540 U.S. 1, 8 (2003))).[15] [16]

In sum, because Mullens did not meet his burden to show that counsel's investigation and presentation of mitigating evidence was "outside the broad range of reasonably competent performance under prevailing professional standards[,]" *Guardado v. State*, 176 So. 3d 886, 892 (Fla. 2015) (quoting *Walker v. State*, 88 So. 3d 128, 134 (Fla. 2012)), the postconviction court erred in finding counsel deficient.

---

15. In finding counsel deficient, the postconviction court also noted as "interesting" the poor communication among the defense team, one attorney's alcohol abuse, and another's depression. However, these generalized grievances do not meet *Strickland's* particularity requirement—mandating that defendants identify *particular* acts or omissions that fall below objective bounds of reasonableness. *See Conde v. State*, 35 So. 3d 660, 664 (Fla. 2010). And, to the extent that these issues bore on the alleged failings discussed above, they do not provide an independent basis for finding counsel deficient. *See Hilton v. State*, 326 So. 3d 640, 650 (Fla. 2021).

16. In his answer brief, Mullens underscores testimony by one of the defense attorneys stating a belief that the defense team did a poor job. However, the "*Strickland* standard of objective reasonableness does not depend on the subjective intentions of the attorney, judgments made in hindsight, or an attorney's admission of deficient performance." *O'Neal v. Burt*, 582 Fed. Appx. 566, 572 (6th Cir. 2014) (quoting *Jennings v. McDonough*, 490 F.3d 1230, 1247 (11th Cir. 2007)).

## D. Prejudice

However, even if counsel had performed deficiently, we would reverse as Mullens also failed to demonstrate prejudice. Like the deficient performance inquiry, prejudice presents a pure legal matter when, as here, the inquiry does not depend on factual issues. Based on our de novo review, *see Brown*, 304 So. 3d at 257, we find error in the postconviction court's determination of prejudice.

As alluded to above, "penalty-phase prejudice under the *Strickland* standard is measured by 'whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court.' " *Wheeler v. State*, 124 So. 3d 865, 873 (Fla. 2013) (quoting *Hurst*, 18 So. 3d at 1013). We now discuss these factors and why they do not support the postconviction court's ruling.

Here, the trial court found three aggravating circumstances— Mullens was "previously convicted" of violent felonies (i.e., the contemporaneous murders and the attempted murder of Barton), the murders occurred during the course of an armed robbery, and

(as to Hayworth) the murder was committed to avoid arrest.[17]  The

court assigned great weight to each aggravator.  Of note, we have

repeatedly characterized the prior-violent-felony and armed-robbery

aggravators as "among the most serious aggravating

circumstances."  *Wilcox v. State*, 143 So. 3d 359, 387 (Fla. 2014)

(citing *Chamberlain v. State*, 881 So. 2d 1087, 1109 (Fla. 2004);

*Walker v. State*, 957 So. 2d 560, 585 (Fla. 2007)); *see also Silvia v.

State*, 60 So. 3d 959, 974 (Fla. 2011) (prior violent felonies

considered "one of the weightiest aggravators" (citing *Sireci v. Moore*,

825 So. 2d 882, 887 (Fla. 2002))).  We further stress that the State's

proof of aggravating factors—consisting of detailed surveillance

video and judgments and sentences—would not have been

undermined in any respect by Mullens's evidence at the

postconviction hearing.

As for mitigation, the trial court found two statutory

mitigators—substantial impairment and extreme emotional

disturbance—assigning moderate weight to each.  The court also

_____

17.  We do not rely on the avoid-arrest aggravator as to Uddin.

- 28 -

found six (consolidated) nonstatutory mitigating circumstances—assigning various weight ranging from little to some.

Despite the substantial mitigation presented, the trial court concluded that the aggravating circumstances "far outweigh[ed]" the mitigating circumstances. In finding counsel ineffective, the postconviction court relied principally on the testimony of two postconviction experts and their overall observations of Mullens. But, in our view, there is no reasonable probability that such evidence would have altered the balance of aggravating and mitigating circumstances.

First, the experts' opinion was contradicted by certain evidence presented at the penalty phase. The surveillance video depicts in graphic detail Mullens brutally killing Uddin and Hayworth and attempting to kill Barton. That video also shows Mullens engaging in goal-oriented conduct and overcoming difficulties in accomplishing the crimes. For instance, Mullens was able to overcome an issue with the defective revolver while in the midst of a physical struggle with Barton. Indeed, the postconviction experts did not explain how any of their diagnoses were consistent

with the video evidence.[18] Nor did they explain how Mullens's improvement while on medications would be consistent with a finding of permanent brain damage.

Second, the postconviction experts' opinions lacked corroboration. Drs. Maher and Ouaou both noted the importance of brain scans as confirming brain damage, but the court discounted the only brain scans admitted at the hearing as unpersuasive. Thus, the corroboration—which both experts claimed to be of great significance—was lacking. Moreover, apart from Dr. Maher's bipolar diagnosis, the other diagnoses by Drs. Maher and Ouaou are not supported by pre-penalty-phase records. Similarly, the postconviction experts' opinions credited the allegations of head injury for which there was absolutely no documentation.

Third, the opinions of Drs. Maher and Ouaou lacked specific details as to Mullens's mindset at the time of the murders. While the trial court, in its sentencing order, faulted Dr. Machlus for not obtaining that information, neither Dr. Maher nor Dr. Ouaou

18. Based on our record, it appears that unlike Drs. Gamache and Machlus, Drs. Maher and Ouaou did not view the surveillance videos in forming their opinions.

obtained that information from Mullens either. Accordingly, their opinions left the postconviction court in no better position than the trial court, that is, it too had to "speculate as to [Mullens's] condition and mental state when he murdered Uddin and Hayworth and attempted to murder Barton." Sentencing Order at 10; *see Butler v. State*, 100 So. 3d 638, 666 (Fla. 2012) ("Dr. Caddy did not connect [mental-health] deficiencies to the crime itself or explain how they would have affected Butler's actions at the time of the murder." (citing *Rutherford v. State,* 727 So. 2d 216, 224 (Fla. 1998))).

In the end, the expert opinion on which the postconviction court relied was contradicted by the record and uncorroborated. That evidence was insufficient to meet *Strickland's* prejudice prong. That is, we cannot say, as a matter of law, that there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different had this uncorroborated and contradicted opinion evidence been presented at the penalty phase.[19]

---

19. We further note that in conducting an abbreviated prejudice analysis, the postconviction court did not consider the

Mullens's arguments to the contrary lack merit. First, noting

the judge who ordered a new penalty phase was the same one who

had imposed the death penalty, Mullens asks us to simply accept

the postconviction court's statement that he personally would have

imposed a life sentence had he heard the mitigating evidence

presented at the postconviction hearing. As properly noted by the

State, Mullens is wrong to suggest that this assertion is dispositive

of the prejudice analysis. *See Strickland*, 466 U.S. at 695 ("The

assessment of prejudice should proceed on the assumption that the

decisionmaker is reasonably, conscientiously, and impartially

applying the standards that govern the decision. It should not

depend on the idiosyncracies [sic] of the particular decisionmaker,

such as unusual propensities toward harshness or leniency.

Although these factors may actually have entered into counsel's

selection of strategies and, to that limited extent, may thus affect

the performance inquiry, they are irrelevant to the prejudice

---

nature of the aggravating circumstances or the key evidence—
including the surveillance videos—on which the trial court relied in
imposing the death sentences. We also note that the postconviction
court did not acknowledge the extensive mitigation evidence that
was presented at the penalty phase, including the compelling
testimony by Mullens's now-deceased mother.

inquiry."); *Stephens v. State*, 748 So. 2d 1028, 1031-32 (Fla. 1999) (noting that prejudice is *legal* conclusion which is accorded no deference); *Sochor*, 883 So. 2d at 781 ("[O]ur job is to review *independently* the circuit court's *legal conclusion*—that is, whether Sochor has carried his burden of demonstrating a reasonable probability that the result of the penalty phase would have been different had counsel not been deficient." (emphasis added)). Accordingly, we decline Mullens's invitation to abandon the prejudice analysis mandated by our case law and that of the Supreme Court. *See Strickland*, 466 U.S. at 695; *Stephens*, 748 So. 2d at 1031-32; *Sochor*, 883 So. 2d at 781.

Second, Mullens asserts that the "new mitigating evidence fundamentally changes the balance of mitigating and aggravating evidence." According to Mullens, this conclusion flows from our case law as well as that of the Supreme Court. We have considered the cases on which Mullens relies but find them to be distinguishable. Of particular significance, the cited cases involved postconviction evidence which bore no relation to the mitigation presented at the trials. Such was not the case here.

- 33 -

In sum, because Mullens failed to demonstrate deficient performance or prejudice, the postconviction court erred in granting a new penalty phase. We now turn to Mullens's cross-appeal.

### III.   CROSS-APPEAL

In his cross-appeal, Mullens challenges the denial of three claims. We address each below.

### A. Ineffectiveness in Advice to Plead Guilty and Waive a Penalty-Phase Jury

Mullens argues that the postconviction court erred in denying his claim that counsel was ineffective for advising him to plead guilty and waive a penalty-phase jury. We reject this argument.

*(1)Guilty Plea*

Mullens primarily contends that counsel failed to discover jail documents showing that he was on an antipsychotic medication in the roughly 18 months leading up to his guilty pleas. In his view, this failure was objectively unreasonable. However, contrary to Mullen's argument, there is competent substantial evidence supporting the court's denial of this claim. *Brown*, 304 So. 3d at 257 (noting appellate court's deference to factual findings supported by competent substantial evidence). Specifically, the record

demonstrates that defense counsel was well aware of the medication Mullens was taking and its effect on him during the relevant time period—regardless of the jail's documentation.

Relatedly, Mullens relies on Dr. Maher's opinion on the antipsychotic medication and its effect on Mullens. However, Mullens's reliance on that opinion is misplaced. Specifically, Mullens overlooks or discounts evidence supporting the court's implicit finding that the medication did not undermine his ability to enter voluntary guilty pleas. *Brown*, 304 So. 3d at 257. As noted above, there was evidence that the medication improved Mullens's ability to think, communicate, and obey jail staff. And, according to jail staff, Mullens appeared lucid while on the medication. What is more, Mullens was actively involved in the plea colloquy during which he acknowledged the positive effects of the medication.

Mullens also suggests that counsel ignored the turmoil he was experiencing in the days leading up to his guilty pleas—turmoil stemming from the recent passing of his sister. The postconviction court found that any such turmoil did not interfere with his ability to enter voluntary pleas. Again, Mullens overlooks or discounts evidence supporting that finding—including the length of time from

his sister's passing to the change-of-plea hearing and his involvement and answers during the plea colloquy.

Finally, Mullens faults counsel for forging ahead and advising him to plead guilty despite residual concerns about his competency. At the evidentiary hearing, trial counsel acknowledged disagreement with the trial court's competency ruling. However, trial counsel did not identify any additional grounds for incompetency arising subsequent to the trial court's ruling on that issue.[20] Thus, the record simply does not support this aspect of Mullens's claim.

Accordingly, because the court's legal analysis was correct and competent substantial evidence supports the court's findings, Mullens's plea-related argument lacks merit.[21]

---

20. To the extent Mullens suggests that jail records from 2013 would have led to a different ruling on the issue of competency, Mullens is mistaken. The trial court made its ruling on that issue in 2011, well prior to the circumstances later documented in the 2013 jail records.

21. Mullens has also failed to demonstrate prejudice. *See Sanchez-Torres v. State*, 322 So. 3d 15, 20 (Fla. 2020) ("[P]rejudice . . . in the plea context . . . means that 'a defendant must demonstrate "a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial." ' " (quoting *Long v. State*, 183 So. 3d 342, 345 (Fla. 2016))). In *Grosvenor v. State*, 874 So. 2d 1176, 1181-82 (Fla. 2004), we identified several factors bearing on the issue of

*(2)Jury Waiver*

To establish deficient performance as to this component of his claim, Mullens relies on three grounds. But none supports reversal.

First, he argues that counsel's mitigation investigation was deficient—relying on the same conduct or omissions discussed in the State's appeal. However, we have rejected Mullens's contention that counsel was deficient in this regard. Accordingly, we have already rejected the core premise upon which this argument rests.

Second, Mullens asserts that counsel severely understated the risks of waiving a penalty-phase jury. Quite simply, he points to no portion of the record to support this argument. And we have found none. Accordingly, this aspect of Mullens's claim lacks any record support. *See Jackson v. State*, 47 Fla. L. Weekly S167, S169 (Fla. June 30, 2022).

Third, he argues that trial counsel was deficient in various respects in light of *Hurst v. Florida,* 577 U.S. 92 (2016), a decision

---

whether a defendant would have rejected a plea and instead insisted on going to trial. Having carefully reviewed the record, we find that those factors support a finding of no prejudice here.

issued more than two years after Mullens's penalty phase. In advancing this argument, Mullens essentially asks us to find counsel deficient for failing to anticipate that decision. However, consistent with *Strickland*, we have repeatedly held that counsel is not deficient for failing to anticipate changes in the law. *See Smith v. State*, 310 So. 3d 366, 371 (Fla. 2020); *Hall v. State*, 246 So. 3d 210, 216 (Fla. 2018); *Lynch v. State*, 254 So. 3d 312, 323 (Fla. 2018).

## B. Intellectual-Disability Claim

Mullens next argues that the postconviction court erred in denying his intellectual-disability claim. The postconviction court denied this claim, noting that Mullens would not be prohibited from later filing a motion pursuant to rule 3.203 of the Florida Rules of Criminal Procedure. We summarily affirm that ruling. We add only that, under rule 3.203, Mullens will be required to establish good cause to excuse his failure to meet the rule's timing requirement. We express no view on whether the record, as it now stands, would support a finding of good cause.

## C. Cumulative-Error Claim

As the final issue raised on cross-appeal, Mullens argues that the accumulation of his trial attorneys' errors at the guilt and penalty phases deprived him of a fundamentally fair proceeding. However, since Mullens failed to establish deficient performance in any respect, there is no prejudice to consider cumulatively. *See Sheppard*, 338 So. 3d at 829 (no prejudice to accumulate where there is no deficient performance).

## IV.   CONCLUSION

For the reasons given above, we reverse the granting of a new penalty phase but affirm in all other respects.

It is so ordered.

MUÑIZ, C.J., and CANADY, LAWSON, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., dissents with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

The postconviction court's findings and sound reasoning notwithstanding, the majority concludes that Mullens failed to meet

his burden of proving ineffective assistance of counsel. I respectfully dissent.

Notably, during the penalty phase, trial counsel presented the testimony of only *one* mental health expert, Dr. Machlus—an expert who had no prior experience with death penalty cases. The majority suggests that neither the reliance on a mental health expert with no prior experience in death penalty cases, nor the reliance on the testimony of a single mental health expert would constitute deficient performance. However, in this case, both of these circumstances are present, *and* they are accompanied by the extensive factual findings of the postconviction court.

Relying on factual findings summarized in the postconviction order, which even the majority largely credits as "accur[ate]" and "expansive," *see* majority op. at 22-23, the postconviction court concluded that Dr. Machlus "ignored the assessments and suggestions of the mitigation specialist," disagreed with counsel's own assessment of Mullens, and failed to recognize multiple "red flags" indicating that further diagnostic testing was necessary. In addition, counsel failed to investigate and present significant mitigation evidence during the penalty phase. For these reasons, I

cannot agree with the majority's conclusion that counsel's representation of Mullens was objectively reasonable.

This Court must defer to the circuit court's factual findings that are supported by competent, substantial evidence. *See Simmons v. State*, 105 So. 3d 475, 503 (Fla. 2012) ("Both prongs of the *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] test present mixed questions of law and fact; thus, in reviewing a trial court's ruling after an evidentiary hearing on an ineffective assistance of counsel claim, we employ a mixed standard of review, deferring to the postconviction court's factual findings that are supported by competent, substantial evidence, but reviewing the postconviction court's application of law to the facts de novo."). In this case, there is competent, substantial evidence to support the postconviction court's findings.

Several members of the defense team testified that they were "frustrated" and "confused" by Dr. Machlus's handling of Mullens' case. Tiffany Cunningham, a licensed clinical social worker and the defense's mitigation specialist, testified that she spoke to Dr. Machlus multiple times about the need to further assess Mullens'

neurological issues, but "Dr. Machlus never seemed to hear her."

The postconviction order explained:

> Ms. Cunningham continually pointed to evidence of numerous head traumas, indicators of PTSD, and indicators of fetal alcohol disorder. Further, she continually indicated possible brain damage or at least the necessity of neuropsychological testing, and noted indicators of intellectual disability. This information was either not shared with Dr. Machlus or Dr. Machlus disregarded it despite apparent signs that other medical experts easily picked up on and to which counsel testified they were familiar with.

Frustrated that Dr. Machlus "was not understanding Mr. Mullens' case well," Cunningham urged counsel to hire a different expert or obtain a second opinion. While counsel did contact a neuropsychologist—who "shared his suspicion of a frontal lobe dysfunction"—counsel did not request that he administer additional neurological testing or present his testimony during the penalty phase.

Perhaps more disconcerting is trial counsel's presentation of Dr. Machlus's testimony that Mullens did *not* suffer from PTSD. Cunningham concluded that as a result of physical and sexual abuse that occurred during Mullens' childhood and during his time in prison, Mullens suffered from PTSD. In addition to discussions

with counsel, Cunningham submitted multiple reports advising counsel of her observations. Counsel agreed with Cunningham's assessment based on counsel's own observation that Mullens exhibited "a lot of PTSD symptoms"—symptoms corroborated by Mullens' roommate and father during interviews with counsel.[22] But, inexplicably, counsel did not request additional PTSD testing, list PTSD as a mitigating factor, or present Cunningham's findings during the penalty phase. Instead, counsel presented Dr. Machlus's testimony that Mullens did *not* have PTSD. Counsel concedes this was not a part of the defense's strategy.

Trial counsel also repeatedly disregarded Cunningham's concerns that Mullens suffered from brain damage based on reported head injuries and ignored her recommendation that Mullens undergo further neurological testing. In a memorandum to counsel, Cunningham conveyed Mullens' reports of being "knocked in the head hundreds of times by his older brother," "clotheslined at age nine and slamming the back of his head on concrete," and

---

22. Mullens' symptoms included nightmares, "flashbacks of sexual and physical abuse suffered as a kid, an easy startle response, and hypervigilance."

"pistol whipped by a police officer."  He also reported sustaining a head injury at age eighteen upon crashing his mother's car into a house.  In two subsequent reports, Cunningham repeated her concerns that Mullens suffered from neurological issues and recommended further testing by a neuropsychologist.  Counsel admitted knowing about Mullens' head injuries and testified this would typically prompt her "to have a neuropsychological workup conducted."  However, counsel could not explain why she failed to do so here—though she admitted "she was not aware that Dr. Machlus was not a neuropsychologist."

Trial counsel also failed to investigate the possibility that Mullens suffered from fetal alcohol spectrum disorder (FASD).  Based on conversations with Mullens' mother, father, and older siblings, counsel knew that Mullens' mother drank alcohol while she was pregnant with Mullens.  Counsel should have fully explored this potentially mitigating evidence by further investigating whether Mullens suffered from FASD and what effect it had on Mullens.

Moreover, counsel failed to fully explore whether Mullens was intellectually disabled.  The postconviction court found "[t]here was simply no presentation as to Mr. Mullens' adaptive deficits during

the penalty phase, let alone whether they occurred prior to the age of 18.  Additionally, the sentencer was not made aware of the potential implications in how Dr. Machlus administered and scored Mr. Mullens' WAIS IQ score."[23]  The court noted that testimony from a neuropsychologist regarding Mullens' intellectual disability "would have been significant to the sentencer's consideration in imposing life or death."[24]

Not surprisingly, the postconviction court also found that "[t]he communication amongst the attorneys, the mitigation specialist, and Dr. Machlus was poor to the detriment of Mr. Mullens' penalty phase."  This poor communication was directly

---

23.  Dr. Machlus scored Mullens' IQ on the WAIS-IV test at 83, but Dr. Machlus testified that he administered the IQ test over several days, which he conceded was "not the way that it is normally done."  Indeed, breaking up IQ testing is contrary to the WAIS-IV manual and may result in an invalid, artificially inflated IQ score.

24.  The postconviction court also determined that a neuropsychologist's testimony would have been significant to the court's consideration of sexual abuse as a mitigating factor, explaining, "[h]ad counsel consulted . . . a medical doctor and neuropsychologist, it is likely the sentencer would have found this [sexual abuse] mitigation factor to have existed."

attributable to the inadequate investigation and presentation of mitigation during Mullens' penalty phase.

Given the many significant instances of deficient performance in this case, I agree with the postconviction court's conclusion that Mullens was prejudiced to the extent that a new penalty phase is warranted: "Had a more cohesive presentation of Mr. Mullens' mitigation evidence been presented, . . . a reasonable probability exists that the sentencer would have found that the balance of the aggravating and mitigating factors did not warrant death."

For these reasons, I dissent.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Pinellas County,
Philip J. Federico, Judge - Case No. 522008CF018029000APC

Ashley Moody, Attorney General, Tallahassee, Florida, and Marilyn Muir Beccue, Senior Assistant Attorney General, Tampa, Florida,

for Appellant/Cross-Appellee

Eric Pinkard, Capital Collateral Regional Counsel, Julie A. Morley and James L. Driscoll, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida; and Stephen K. Wirth, John P. Elwood, Andrew T. Tutt, and Samuel F. Callahan of Arnold & Porter Kaye Scholer LLP, Washington, District of Columbia,

for Appellee/Cross-Appellant